# Lloyd I. Ross v. State.

No. 24094.  November 3, 1948.
Rehearing Denied May 11, 1949.

*Fred L. Blundell,* Lockhart, *Leonard Brown,* San Antonio, *C. C. Jopling,* La Grange, and *J. H. Schyler,* New Braunfels, for appellant.

*A. J. Luckett,* County Attorney, New Braunfels, *John C. Marburger,* County Attorney, Bellville, and *Ernest S. Goens,* State's Attorney, Austin, for the state.

BEAUCHAMP, Judge.

The appeal is from a conviction for murder with a death penalty.

Dr. Lloyd I. Ross was a practicing surgeon in the City of San Antonio. Through the years he became acquainted with Willard York and intrusted to him for investment a large amount of securities. In the early part of 1947 appellant learned that the stocks and bonds and all the securities he had placed with York had been mishandled. The doctor became much troubled over his loss and the fact that his friend had betrayed him. On Sunday morning the 25th day of May, 1947, he left his home in San Antonio and parked his car in Stahl Lane, near the home of Willard York in Comal County, and waited until York and his family came along in their car. The family consisted of his wife, his sixty-seven year old mother, Mary York, his nine year old son, John York, and his thirteen year old daughter, Ann York. Appellant opened fire on the family which resulted in the death of four, leaving only Ann York as the survivor. She escaped by fleeing from the car while he was shooting at her. The prosecution is for the murder of Mrs. Gertrude York, wife of Willard York.

The appellant then returned to San Antonio and voluntarily surrendered to the city police, to whom he told the story of the killing in Comal County. Communication was had with the sheriff's department in New Braunfels, where the appellant was lodged in jail later in the day. He was denied bond and retained in jail in Comal County until his case was called for trial in September following. After an effort to secure jurors qualified under the law, the court, on his own motion, trans-

ferred the case to Fayette County, where it was called for trial October 13, 1947. The lengthy trial brings to his court quite a voluminous record, with seventy bills of exception for our consideration. These complain of the action of the court in changing the venue of the case; also many objections to non-expert witnesses' testimony as to the mental condition of the accused; and chiefly the grounds upon which reversal is sought seems to be that the evidence of insanity, as produced by the appellant, was so impressive that the judgment should not be permitted to stand. There are also objections to the court's charge and to the argument of the district attorney in several particulars. The opinion will deal with these questions and such others as might be properly involved by them.

We note the views expressed in appellant's brief on the law of insanity. The requested charges and exceptions to the charge indicate that both the court and counsel for defendant had reviewed extensively the law on the subject in other jurisdictions as well as in Texas. On some questions there is sharp disagreement between the states as to what the law should be. The opinions by the various courts in Texas, civil as well as the court of criminal appeals, might, in instances, be subject to discussion, but we think there is no conflict so far as the law of the case now before us is involved.

We may eliminate a discussion of a large part of the record by the positive statement that Texas does not recognize the doctrine of irresistible impulse. Carnes v. State, 275 S. W. 1002. Much of the evidence in the case presents conclusions of witnesses, based on the idea which the witness had that circumstances had developed in the appellant an irrisistible impulse which drove Dr. Ross to the murder of Willard York, and with him his wife, Gertrude York.

Eliminating all discussion about the types of insanity, the one controlling question in this case is whether or not the accused was so mentally deranged at the time of the commission of the alleged offense as to make him incapable of knowing the right from the wrong in the particular transaction, and that it was a thing he ought not to do. Davidson v. State, 4 S. W. (2d) 74. He might have been indulged even from childhood so that he gave undue importance to his own position in matters. He might have been sensitive, suspicious, and retiring. He might have been abnormal, as concluded by the psychiatrists, all the days of his life. His nerves might have been frayed because of his strenuous professional duties and the worry

which his losses brought upon him. Yet the question remains: Did he have sufficient mental capacity at the time of the tragedy to know and understand the right from the wrong in the particular matter involved?

The circumstances under which the murder took place are important. His actions before and after the tragedy were considered by the jury. His life experiences were presented to the jury and utilized by them in determining the mental capacity of the man at the very time of the shooting. The field of inquiry is wide, but this cannot affect the rule of law which we have stated, and which should be kept definitely in mind in order that we may discuss more briefly such questions as appear to call for treatment in this opinion.

The first question complains of the action of the judge of the district court in transferring the case from Comal County to Fayette County for trial. We see no ground for complaint in this. A large number of jurors had been examined. Ten qualified and had been accepted by both sides. The court, on his own motion, at this time transferred the case and gave as his reason that he had become satisfied that a trial alike fair and impartial to the accused and to the state could not be had in Comal County, for the reason that the examination of one hundred and seventy-three veniremen and talesmen showed that the facts of the alleged crime "* * * have so permeated the entire citizenship of the county, from what can be discerned from the jurors, from the veniremen and the talesmen, that there is hardly a man in the county who has not made up his mind either one way or the other, and it further appearing to the court from the facts and circumstances which have come to the knowledge of the court during the proceeding herein that justice demands and the interests of the accused and the state would better be served by a transfer of this cause to some other county for trial." Nothing is presented in the record to refute this finding and it will be presumed that the trial court had a basis for it. Under such presumption we cannot say that he was not authorized to transfer the case.

Of the seventy bills of exception, we find a great many relate to the admission of evidence and will be considered under classifications along with a discussion of what appears to be the chief grounds upon which a reversal is sought. We might summarize the argument, both in the brief and that made orally, by saying it was the view of appellant's counsel that the evidence is so overwhelmingly in favor of the plea of insanity that the verdict of the jury, assessing a death penalty, should not

stand. On this issue we have given careful consideration to the testimony of all of the witnesses produced. They come under two classifications; those who had known the appellant for some time, who had been associated with him intimately and were in position to detail the acts and conduct of the man for the consideration of the jury and as a basis for expert testimony; the other class would be those who did not know him intimately but who examined him for the purpose of testifying to their conclusions as experts.

Of the first class there are a great number; patients, some of whom had been engaged with him in social activities also; nurses who had worked for him in his office or aided in his operations; and doctors who had even better and more frequent opportunities to observe him in his professional connection as well as social activities. Each and all of these witnesses claimed a definite understanding of the man. They pictured him as a very capable surgeon, one who was extremely meticulous, interested in his profession above all things else, quite courteous, and possessed the qualities of a perfect gentleman in his office and out of it. Generally, they described a definite change in the man soon after publicity was given to the failure of the York Company and his loss in such failure. He had talked to them about his loss. He had revealed his fear of his health condition. He had expressed disappointment in the betrayal of a friend (Willard York). He had an appearance of untidiness not theretofore characteristic of him. He was forgetful and nervous; was seen to drop his cigarette with a lighted match on the rug and did not realize it. He sometimes failed to recognize friends when he met them. On one occasion, shortly before the homicide, a couple, close friends, visited in his home for the evening and he sat in perfect silence and never uttered a word. There is other evidence along this line not mentioned and there is evidence to contradict it. Even a doctor friend introduced by the defense, who expressed an opinion that he was insane on the day of the killing, visited with him the day before and they were together a considerable time. This witness said he was not insane then. Other associates testified as state witnesses and by their evidence raised issues of fact for the jury pertaining to his mental state during the months previous to the homicide, at the time—and continuously to the date of the trial.

The state introduced rebuttal testimony which impliedly contradicted any conclusion that might have been made from the first group of the defense witnesses.

Among the witnesses who testified that appellant was insane at the time of the homicide are two psychiatrists of San Antonio, Dr. Anna Boyd and Dr. W. J. Johnson. Each of these witnesses described the man in positive terms. Dr. Boyd said the appellant thought everybody was commenting on him, they were watching him as he went along the street and about his work. He thought the doctors took a delight in his plight, that certain doctors hated him and were spying on him, that he had delusions that his wife had turned his daughter against him. After the commission of the crime he concluded that he was a part of God's infinite plan; that all of his ailments and misfortunes were a part of that and he even had hallucinations. He said that his insanity at the time of the killing had grown from the suffering he had gone through in early ailments; that he in fact did not at the time of the killing understand the nature of his act and the consequence of it—was not able to distinguish between right and wrong. On cross-examination the doctor said this type of insanity comes on very gradually and that it had existed for several years, saying: "He has not been normal for several years; in fact I testified a while ago that he has been insane for several years." His complications had resulted in several types of insanity for some time and that he will always be so, will get worse; that he had never been quite normal; was poorly adjusted. This is denominated a schizoid personality, "* * * which means he was withdrawn into himself and is retiring and too sensitive. * * * Certainly he has had a strongly marked paranoia tendency all along."

Dr. Johnson testified more extensively that appellant did not understand the nature and consequence of his act at the time of the killing—did not understand right from wrong in the particular act with which he was charged. This answer was given from personal examination and was repeated in answer to a hypothetical question. His testimony followed much the line of that of Dr. Boyd, above summarized. On cross-examination he said, "There is a basic defect in this man and always has been; it is what we call a schizoid personality and he has developed a paranoia trend with delusions of persecution." He said the condition is partly hereditary and described his type as being suspicious, moody, withdrawing from reality, they have delusions and defective judgment relative to them. He says this man only had two friends in his life; that he is suspicious of everybody, his lawyer, his wife, and everyone else; that he cannot see life as an ordinary individual does; that his kind of insanity is progressive and will break under stress and strain. He continued, "This defendant has been unstable all his life, but he has been insane since the moment he could

not adjust himself for the last two or three years." He concludes that he is insane now, will continue to be, and has been insane, in his opinion, for two or three years. Quoting (S. F. p. 28): "The man's history is the history of an inadequate individual who is not equipped to meet the ordinary situations of life in any way."

It requires no comment to point out the conflicts between the two classifications of witnesses we have discussed. If the associates, the non-expert witnesses, are correct in their judgment of the man, the experts misunderstood him entirely and there would be but weak and inconsiderable evidence from the first class upon which the conclusion may be reached that the accused did not, at the time of the homicide, have the ability to understand the right and wrong of the thing in which he was engaged. The friends and associates pictured him as a fine character. He had many friends and they testified for him as such. He was affable. The strongest conclusion which might be reached from the testimony of the great majority of them was that he committed the offense under an irresistible impulse. It was not that he could not understand, but that he could not control his action. Under such facts he should be made to pay the penalty of the law, since the jury so decreed.

If the jury had accepted the evidence of the expert witnesses it would have been a finding that practically all of the conclusions of the other witnesses who appeared in his behalf were entirely without foundation. In view of such conflicts it is not surprising that the jury, acting under the court's charge, returned their verdict in the short period of time complained of in the motion for a new trial. When we consider the testimony of the many witnesses for the state directly in conflict with much of that upon which appellant relies to establish his insanity, there could be no question that there is evidence to support the jury's finding. Particular attention is directed to the fact that following the shooting he returned to San Antonio, went to the police station and surrendered himself to be imprisoned for his crime. It would be singular that a man should do this in the absence of any realization of wrong doing.

We have examined the many bills complaining of the qualifications of non-expert witnesses to testify to the mental condition or, rather, conclusions as to the changed state of the man. Such proffered evidence called for expert opinion and was not admissible. The rule involved is well established by many decisions of our state so that the question is elementary. We think that in each case the court ruled properly.

Another objection seriously urged complains that the court did not limit evidence of the killing of all other members of the York family at the time. It was all one transaction. A witness could hardly testify to the killing of Mrs. Gertrude York, for whose murder he was charged in the instant case, without relating the facts which show the murder of the other three. It was a part of the res gestae. We are unable to understand what language the court could have used to limit the evidence with effect so as to give any relief to appellant.

In Bills of Exception Numbers 58 and 59, complaint is made that the district attorney in arguing the case went outside of the record, making a prejudicial argument, wherein he said, "They talk to you, 'Why don't they bring a doctor here to testify?' Every one says, the Court will remember, not once but many times, they say, 'Why doesn't the State bring a doctor in here to testify in this case?' I will tell you why. Blundell says every doctor in San Antonio knows this man; I tell you there isn't a doctor in San Antonio that will testify against him. That is what the State of Texas is up against in this case. Not only in San Antonio, but anywhere else. Think of it. Think of it. Who is trying to mislead you gentlemen? Why doesn't the State of Texas bring a doctor in here, they say. That is the answer."

In Bill No. 59 it is claimed that the district attorney said, "I am telling you again, the State of Texas can't bring you a doctor. They challenged me to tell you why the State of Texas didn't bring in a psychiatrist." Objection is further made that the foregoing argument was prejudicial and inflammatory.

From the very language which the district attorney used it appears that his statement was invited. The argument for the defense called for such an answer. They had asked him a question outside of the record. The rules do not require that he ignore the defense argument and it is not considered error that he gave to them such answer as their question calls for. The bill is defective in that it does not negative the proposition that it was made in reply or in response to argument of the defense attorneys. Lerma v. State, 200 S. W. (2d) 635; Dinklage v. State, 198 S. W. (2d) 578, and cases there cited.

The same defect above pointed out is found in subsequent bills relating to the argument of the prosecution.

Bill of Exception No. 70 complains of the misconduct of the jury, as shown by appellant's motion for new trial, to the effect

that the jury deliberated only fifteen minutes. It is contended that this shows the jury did not base its verdict on the testimony and the law. We know of no rule of law requiring that a jury consume any specified time. The trial had lasted several days, many witnesses had been called, the evidence of each was very similar to the other. It was a repetition of similar facts day after day. When the charge had been read, the attorneys spent several hours arguing the case. Presumably they applied the law to the facts and the jury had an opportunity to be familiar with both the law as given in the charge and the facts submitted before them. If the first ballot showed they were of one mind, appellant could have little hope that hours of discussion among the jury would give him any material assistance. The bill shows no error.

Bill of Exception No. 36 contains a lengthy exception to the court's charge on the defense of insanity. This complains of sections 10 to 24 inclusive, and embraces more than one subject. The defendant objected and excepted to the court's charge on insanity because the court does not, in its charge, differentiate between facts to be considered by the jury on the issue of insanity at the time of the commission of the offense as distinguished from the issue of insanity at the time of the trial.

Special objection is then directed to section 13 of the court's charge and the reason therefor was that the charge placed too great a burden upon the defendant and is not the law of the state. We cannot commend the treatise on the law of insanity which the court gave, nor his instruction to the jury as to "* * * a safe and reasonable test in all cases * * *." This part of the charge does not purport to define the law but is rather an instruction to the jury, apparently for the purpose of guiding them in the reasoning which they should indulge. Certainly it was not necessary, but it was favorable to the party on trial and the harm resulting from it, if any, would be against the state and not the accused.

We find no reversible error and conclude that the judgment of the trial court should be affirmed. It is so ordered.

### ON MOTION FOR REHEARING.

GRAVES, Judge.

Appellant insists that we erred in holding the facts sufficient to support the conviction.

Early on the morning of Sunday, May 25, 1947, appellant, with a high-powered rifle in his car, drove to what is known as the "Stahl lane" in Comal County, which led to the York ranch, where Willard York and his family resided. He parked his car in the lane or road and waited for some evident purpose. Shortly thereafter, Willard York, accompanied by his wife, Gertrude York, his mother, Mary York, his thirteen-year old daughter, Ann York, and his nine-year old son, John York, drove up in his car and stopped as appellant's car had the roadway blocked. Appellant got out of his car with the rifle in his hand, and without saying anything or replying to the pleading of Gertrude York, who said, "Don't shoot, Lloyd, don't shoot," he opened fire on Willard York, killing him. Then moving the gun, he killed Gertrude York, reloaded his rifle and killed John York, who fell close by the side of the right door of the car. He then killed sixty-seven-year old Mary York, the mother of Willard York, who had gotten out of and was standing some twenty feet back of the car. He then fired at Ann York, who was struck by a bullet in her leg as she fled down the road, but was not killed. A more brutal or horrible crime could hardly be conceived.

As mitigating the crime, it was shown that appellant entrusted to York, his friend and investment banker, his life savings and inheritance for investment, and that about two months prior to the killing he learned that York had used his funds and lost them, as a result of which he filed a suit against York claiming improper use of the funds. York then filed a petition in bankruptcy in which he listed appellant as an unsecured creditor for $80,279.67, thus furnishing a motive for this multiple killing.

Appellant's sole and only defense was that of insanity at the time of the commission of the crime and at the time of the trial. As supporting that defense, appellant points to the facts of the killing which, it is insisted, of and within themselves evidence the act of an insane person.

Doctors, patients, and nurses, as well as nonexpert witnesses who had been associated with and knew appellant, testified that he was insane, as did also eminent psychiatrists and specialists in mental diseases, expressing the opinion that appellant was unable to distinguish between the right and wrong of his acts. In addition, it was shown that appellant's mother was insane for five years before her death. Appellant's life history was shown, exhibiting his gradual mental decline from the normal to the abnormal and finally to insanity.

There is no question but that the facts as a whole presented a very strong defense of insanity. To combat that defense, the state relied alone upon the testimony of nonexpert witnesses as will be more fully shown by a discussion hereafter of certain bills of exception. No doctors or medical experts testified that appellant was sane.

If we understand appellant's contention that the facts are insufficient to support the conviction, it is that the insanity defense was so overwhelmingly shown that this court should not permit the conviction to stand.

Mere mental deficiency or derangement, though it may constitute a form of insanity known to and recognized by medical science, does not excuse one for crime. The insanity that excuses for crime is that known as the "right and wrong test," that is, the capacity of the accused to distinguish right from wrong in respect to the act charged as a crime at the time of its commission and the probable consequences of his act. If a person has sufficient mental capacity to understand the nature of the particular act or acts constituting the crime and to know whether they are right or wrong, he is responsible if he commits such act or acts. If he does not possess that degree of capacity of mentality, he is not responsible. The rule stated is the generally accepted doctrine, not only in this state, but in all other jurisdictions where a different rule is not applied by statute.

Insanity that excuses for crime is a fact question which must of necessity be determined by the jury under proper instructions from the court. It was the sole province of the jury to believe or not believe the appellant's defensive testimony. In the exercise of that discretion, the jury chose not to believe that defense, but rather to accept the theory of the state that appellant was sane. This court is without power to say that they were not authorized to do so. The facts are sufficient to support the conviction.

Appellant urges that the strong insanity defense presented becomes of material importance in considering certain of his bills of exception complaining of the receipt in evidence of the testimony of certain nonexpert witnesses attesting the appellant's sanity. These bills will be considered together.

Bill of Exception No. 16 reflects the following: In the development of its case in chief, the state proved by the witness Fest, Lieutenant of Police in San Antonio, that at about 11:00

or 11:30 o'clock in the morning of May 25, 1947, which would be about three hours after the killing, appellant appeared at the police headquarters and asked Fest, "Who is in charge of the office?" Upon Fest's replying that he was in charge, appellant stated, "I think I killed a man. * * * Yes, I think I killed a man by the name of York." Thereupon Fest asked appellant to sit down, which he did. Fest then called to Lieutenant Hester, who came to the office and took charge of appellant. Upon rebuttal, the witness Fest was recalled by the state, and after again detailing the foregoing facts, he was permitted to testify over objection as follows:

"From my observations of this defendant at the time he was in my office on May 25, 1947, the conversation I had with him, his appearance as I have described in my former testimony, his demeanor and his behavior on that occasion, it is my opinion that Lloyd I. Ross was sane on the morning of May 25, 1947, the date of the commission of the offense with which he is charged, the murder of Gertrude York."

The witness fixed the length of time that appellant was in his office as being ten or fifteen minutes. The witness further testified that he based the opinion expressed by him "solely on the fact that the man came to my office voluntarily, made one statement, I asked him one question, and then he took a seat over in a corner." The witness had not known appellant prior to this time.

By Bill of Exception No. 18 the following appears: Lieutenant Fest turned appellant over to Hester, the lieutenant of the San Antonio Police Department in charge of homicide, who went with appellant to his car parked near the police station and there Hester found in the car the high-powered rifle which was loaded at that time. There was also found in the car an ammunition box containing one loaded shell. Appellant was placed in jail and later turned over to the sheriff of Comal County. Hester saw appellant after he was in jail. The period of time which Hester fixed as covering his opportunity for observation of the appellant was between "45 minutes and an hour approximately." Upon this predicate Hester testified:

"During the time that Dr. Ross was in my custody, all the time that I observed him, he did not at any time do anything other than conduct himself in a normal way. To me his conduct was normal."

This witness had not known appellant prior to this time.

By Bill of Exception No. 25 it appears that Herrera, the city jailer, checked appellant into the jail and asked him the usual questions incident thereto, and then fingerprinted him. During that time appellant asked permission to use the telephone and call an attorney. Herrera looked up the telephone number and dialed it for him as appellant could not see well without his glasses. Herrera said that appellant was in his presence about forty-five minutes or an hour. Based upon that observation, Herrera testified that in his opinion appellant was sane at that time. He had not known appellant prior to this time.

To the testimony of each of those witnesses who attested to appellant's sanity, the objection was urged that a sufficient predicate had not been first laid in that there was not shown close or intimate relations or period of time sufficient to authorize the witness to express the opinion that appellant was sane.

Every person is presumed to be sane until the contrary is shown. It is by reason of this presumption that the law casts upon one relying on insanity as a defense to crime the burden of establishing such fact by a preponderance of the testimony. See Craven v. State, 93 Tex. Cr. R. 328, 247 S. W. 515; Ex parte McKenzie, 116 Tex. Cr. R. 144, 28 S. W. (2d) 133. As the law presumes every person to be sane, it is only by a departure from the normal that the sanity of a person is called in question. So, when witnesses attest to observing nothing in the appearance, acts, conduct, or words of a person that would suggest or lead to the belief that such person was abnormal or of unsound mind, the legal presumption follows that such a person is sane. Therefore, under the law, it may be said that the absence of the abnormal attests of and within itself the fact of sanity. The question as to the admission of nonexpert testimony as to the sanity of the accused has often been before the courts.

In Shields v. State, 104 Tex. Cr. R. 253, 283 S. W. 844, the rule is stated as follows:

"The rule seems well settled in this state that a nonexpert witness, who has shown reasonable opportunity to observe the acts and conduct of the party inquired of, may state that he has never observed anything in the acts, speech, demeanor, or conduct of such party which were peculiar or which led witness to believe or conclude such party of unsound mind or abnormal."

Therefore, the test in reviewing the action of the trial court in admitting nonexpert testimony of sanity appears to turn upon whether "there appears to have been so little knowledge, opportunity, etc., shown to form a conclusion" in regard to the question. The shortness of time in such observation would usually be a matter relating to the weight to be given to such testimony rather than affecting its admissibility. The rule stated has been consistently followed. See Langhorn v. State, 105 Tex. Cr. R. 289 S. W. 57; Upton v. State, 20 S. W. (2d) 794; Moroney v. State, 133 Tex. Cr. R. 579, 112 S. W. (2d) 742; McKee v. State, 118 Tex. Cr. R. 479, 42 S. W. (2d) 77; Newchurch v. State, 135 Tex. Cr. R. 619, 121 S. W. (2d) 998; Henderson v. State, 130 Tex. Cr. R. 409, 94 S. W. (2d) 467.

Appellant presses upon us his contention that the testimony of the witnesses named, and especially that of Fest and Herrera, comes within the rule stated; that is, that there was not shown sufficient knowledge or opportunity for observation to authorize them to say that appellant was sane. In keeping with this contention, appellant relies upon the case of Winn v. State, 136 Tex. Cr. R. 513, 126 S. W. (2d) 481.

We are not in accord with the statement that the holding in the Winn case, supra, lays down the doctrine that an observation of five minutes' duration is too short a time to allow a witness to testify in regard to his conclusion as to one's sanity or insanity. The Winn case again asserts the doctrine as laid down in the case of Shields v. State, 104 Tex. Cr. R. 253, 283 S. W. 844, and is quoted in Malone v. State, 115 Tex. Cr. R. 94, 30 S. W. (2d) 486, as follows:

"In this connection, however, we may say that it being manifestly impossible for this court to lay down any hard and fast rules as to the exact amount and extent of the predicate which should precede the testimony of a nonexpert witness offered to prove the sanity of the accused, we will not hold such testimony incompetent in a given case unless there appears to have been so little knowledge, opportunity, etc., shown to form a conclusion in the regard mentioned, as would manifest an abuse of the discretion of the trial judge."

When all the cases touching the receipt in evidence of the testimony of nonexperts that the accused is sane are viewed as an overall picture, the conclusion appears to be inevitable that each case must be determined upon the facts there presented and that no fixed rule of acquaintance, time, or opportunity for observation may be established, and if the Winn case

is susceptible of such interpretation, to that extent the same is overruled.

Bills of Exception Nos. 11 and 13 complain because the nonexpert witnesses, Aronstein and Jordan, were not permitted to express the opinion that appellant was insane. Appellant argues with much emphasis that if the state was entitled to establish the sanity of appellant by nonexpert witnesses, then he was entitled to prove his insanity by nonexpert witnesses.

It must be remembered that a difference exists in the predicate authorizing a nonexpert witness to testify as to the sanity of the accused and that of one testifying as to insanity. Nonexpert witnesses testifying to the insanity of the accused must state the facts upon which that conclusion is based so that the jury may have the benefit of those facts in weighing the testimony of the witnesses. See 24 Tex. Jur. p. 430, sec. 45; Walthall v. State, 144 Tex. Cr. R. 585, 165 S. W. (2d) 184; also Newchurch v. State, supra.

Nonexpert witnesses are confined to their opinions only at the time of their observations of the accused person and cannot be allowed to project their opinions as to the mental condition of such accused at a future time. It is noted by us that although the witness Aronstein, a nonexpert, testified relative to certain conditions and changes in appellant on Wednesday evening, May 21, 1947, four days prior to this killing, yet nowhere therein was he questioned relative to appellant's insanity on such Wednesday. He was asked the question as to his opinion of appellant's mental condition on Sunday, May 25, 1947, the day Mrs. York was killed. A nonexpert insanity witness cannot be allowed to give his opinion on a question of insanity at a future date. To thus allow would place him in the category of an expert. We do not think that the nonexpert witnesses, Aronstein and Jordan, should have been allowed the prediction that appellant would have been insane on May 25, 1947, as shown in the question which is the basis of Bills Nos. 11 and 13.

The question propounded to Aronstein was as follows:

"Q. And you have already testified to what he said and what he did at that time. Now, based on that and the prior observations of him and the acquaintance you had with him that you have testified to here, on May the 25th, 1947, the time this offense is alleged to have occurred, what is your opinion as to whether or not Lloyd I. Ross was sane or insane?"

The question propounded to Mr. Jordan was as follows:

"Q. Based on what you knew of Dr. Ross for approximately seven years or six years and your observation of him on Wednesday prior to the killing, state whether or not in your opinion, at the time of the homicide, Dr. Ross was sane or insane?"

We do not find any analogy between the lay witnesses of the state being allowed to testify as to appellant's condition on the day of the killing and soon thereafter, a portion of which took place within practically a few minutes of the killing, and on the same day; the difference being four days prior to the killing and a few minutes thereafter. The witnesses, Aronstein and Jordan, gave the facts upon which they could doubtless have based an opinion as of date the day of their observations, but were not asked to do so. They could not invade the realm of expert testimony as to the future.

The rule seems to be well established that a nonexpert witness may delineate his observation of an accused, his attitude, both mental and physical, as compared to his previous attitude, etc., and draw his general conclusion or opinion therefrom, but nowhere have we been able to find any opinion that would allow such nonexpert to say what such opinion would be at a future time such as at the commission of the offense, if such be at a different time from his observation. To allow such an opinion would invade the realm of experts who, from their knowledge, study, and long experience, could therefrom fix a prognosis of such diseased condition of the mind and prophesy its future probable outcome.

We are not willing to say that it was error to refuse to allow these two nonexpert witnesses to testify that they thought appellant was insane on May 25, 1947, basing such opinion on what they had observed on May 21, 1947.

The enormity of this offense might have some weight in evidencing a troubled mind, nevertheless, there might also be found some significance in the fact that had the shots fired at the little girl taken her life, there would have been no witness left to tell of this Sunday morning tragedy.

In submitting the defense of insanity, the trial court gave the following instruction:

"A safe and reasonable test in all cases would be that whenever it should appear from all the evidence, that at the time of doing the act, the defendant was not of sound mind, but

was affected with insanity, and such affection was the cause of the act, and that he would not have committed the act but for that affection, he ought to be acquitted, for in such a case the reason would be at the time dethroned, and the power to exercise judgment would be wanting, but this unsoundness of mind or affection of insanity must be of such a degree as to obliterate the sense of right and wrong, depriving the accused of the power of choosing between right and wrong as to the particular act done."

Specific objection was leveled at that part of the charge which reads, "that at the time of doing the act, the defendant was not of sound mind, but was affected with insanity, and such affection was the cause of the act, and that he would not have committed the act but for that affection," the objection being that such was not the law and placed a greater burden upon appellant than that required by law in that it required the jury to believe, before acquitting appellant upon the ground of insanity, that his insanity was the cause of his committing the murder and that he would not have committed the murder unless he was insane. The paragraph quoted appears in substance, but not in the exact form, as in the charge set forth in Form No. 930, Willson's Texas Criminal Forms, (4th Edition). Such form of charge was expressly approved by this court in Shield v. State, 118 Tex. Cr. R. 509, 38 S. W. (2d) 76.

It would be impossible to write on each and every bill of exception presented to us, the last of said bills being numbered 70, the transcript containing 213 pages, and the statement of facts consisting of 317 pages. To write upon each bill would unduly lengthen this opinion.

The complained of remarks of counsel for the state has been considered and without writing on each bill, we do not see any error evidenced therein.

There are other bills which, while not written on, have been considered and no error found therein.

While appellant had many witnesses who testified to his lack of sanity, yet the state countered with others who testified to the contrary; and this court does not feel called upon to say that the verdict of the jury is not supported by the evidence herein.

We adhere to the conclusions announced in our original

opinion, and the motion for a rehearing will therefore be over-ruled.