358 So.2d 379 (1978)
John Peyton ALEXANDER, II
v.
STATE of Mississippi.
No. 50035.
Supreme Court of Mississippi.
April 19, 1978.
*380 Jacobs, Griffith, Pearson, Eddins & Povall, Charles C. Jacobs, Jr., Cleveland, for appellant.
A.F. Summer, Atty. Gen. by Karey A. Gilfoy, Asst. Atty. Gen. and Henry T. Wingate, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before SMITH, ROBERTSON and LEE, JJ.
SMITH, Presiding Justice, for the Court:
John Peyton Alexander was indicted for murder. He was tried on that charge in the Circuit Court of the First Judicial District of Hinds County, convicted and sentenced to life imprisonment. From that conviction he has prosecuted this appeal.
The victim of the homicide was a Mrs. Robinson, a married woman, with whom Alexander had been involved in what is referred to as "an intimate affair."
The facts relating to the shooting of Mrs. Robinson by Alexander on October 4, 1975 are not in dispute. Nor is there material dispute as to the background facts which preceded and led up to the homicide.
Alexander was the swimming coach at the Jackson Country Club. His parents had been club members for most of his life but had disposed of their membership in 1971 because of financial problems. Both Mrs. Robinson and her husband were members of the club. During the summer months *381 Alexander began having an affair with Mrs. Robinson, a married woman 37 years of age, with whom his duties at the club pool brought him in contact. In the course of the affair there were gifts, visits by Alexander to the Robinson home, automobile rides and even a trip to Florida by Alexander and Mrs. Robinson.
At the end of summer Alexander returned to Vanderbilt University where he was a student. He was called frequently by Mrs. Robinson there. About September 28, 1974 Mrs. Robinson's husband learned of the affair and telephoned Alexander, telling him to stay away from his wife. This call by Mrs. Robinson's husband to Alexander included threats, which Alexander considered dangerous to his life. As a result of Mrs. Robinson's husband learning of the affair, she broke up with Alexander and would have nothing further to do with him. Alexander became depressed and visited a psychologist at Vanderbilt. Later, he dropped out of school. After visiting his sister and friends in New Orleans he returned to Jackson and began living at home with his mother. He was worried by the fact that his parents were having marital problems, although this was not a new experience for Alexander. Alexander's father drank excessively at home and physically and verbally abused Alexander's mother. Moreover, Alexander's father was on the verge of bankruptcy although he had been regarded as wealthy and of high social standing.
After holding some odd jobs Alexander filed an application with the Jackson Country Club for the position of swimming coach, the same job he had previously held. His application was rejected when Mrs. Robinson and her husband circulated a petition to the members stating that Alexander was not competent. Alexander then attempted to secure a similar position at River Hills Club but was met again with rejection allegedly due to acts of Mrs. Robinson's husband, who knew several of the River Hills Club Board Members. Alexander became angry at these actions on the part of the Robinsons' and felt that he was not being treated fairly. He attempted to retaliate by xeroxing some of the love letters written to him by Mrs. Robinson and mailing the copies to several members of the Country Club. His purpose was to show that the petition circulated by the Robinsons stating that he was incompetent to be swimming coach was not based on mere incompetency but upon the affair in which he had been involved with Mrs. Robinson.
Following the circulation of the copies of Mrs. Robinson's letters by Alexander, her husband brought suit against Alexander demanding damages.
Thereafter Alexander obtained a coaching position at the YMCA for the summer of 1975. Alexander's parents had been divorced, remarried, and were in the process of obtaining another divorce.
In September, 1975 Alexander purchased a .380 automatic pistol and ammunition. At this time he had a construction job at Magee but was still living at home with his mother. On the night of October 3, 1975, Alexander attended a birthday party given for a friend, Albert Lamar, at the Golden Dragon Restaurant in Jackson. Alexander left the party and went home. Unable to sleep, he returned to Lamar's home about 11:00 p.m. He and several friends skateboarded in the street until the early morning hours.
The following morning, Saturday, October 4, 1975, Alexander had an engagement to play tennis with one James Anderson at Battlefield Park in Jackson. They played until around 11:15 in the morning and Alexander returned home at about noon.
There he told his mother that he wanted his checkbook so he could buy a new tennis racket. He left home, drove directly to the Parham Bridges Tennis Courts in Jackson, where Mrs. Robinson and one Betty Lewis were just finishing a tennis match. As the two women left the court and were walking past the bleachers, toward their car, Alexander walked rapidly up to Mrs. Robinson, drew his pistol from his pocket, and from a distance of three feet shot Mrs. Robinson in the left side of the head. As she fell, Alexander stepped closer and fired seven *382 more shots into her head and neck as she lay upon the ground.
He then went home and told his mother that he had shot Mrs. Robinson. She directed him to call the police which he did.
The defense offered at the trial was that the homicide was excusable because Alexander was insane and incapable of distinguishing between right and wrong and that he was not guilty by reason of insanity.
On appeal, a number of grounds for reversal are assigned and argued.
It is first contended that the trial court erred in declining to permit several lay persons to give an opinion on the issue of appellant's sanity at the time of the shooting.
In the course of the presentation of appellant's case in chief several lay persons were offered to testify that in their opinion appellant was incapable of knowing the difference between right and wrong at the time he shot Harriet Robinson by reason of insanity.
The first of these witnesses, one Herlihy, was asked the following question:
Do you have an opinion, based on your knowing John Alexander since you were both in the 9th grade, your conversations with him, and your observations of his demeanor, as to whether on October 4, 1975, when Harriet Robinson was shot, he knew the difference between right and wrong?
The State objected and the jury was retired. Out of the presence of the jury an examination of the witness was conducted and the court sustained the objection, ruling that the witness was not qualified to give an opinion as to Alexander's sanity at the time he shot Mrs. Robinson.
On the basis of the examination of Herlihy conducted out of the presence of the jury, it appears that the witness had talked with Alexander in the summer of 1975 and that Alexander had discussed the affair with Mrs. Robinson with the witness at that time. While the witness had seen Alexander the night before the shooting, his observation of him on that occasion extended no further than to note that Alexander had been "edgy" but, the witness said, this was not particularly unusual behavior for Alexander although he thought he was a little more edgy than usual.
In addition to Herlihy, several other lay witnesses were offered by appellant for the purpose of giving opinions that Alexander was insane and unable to distinguish between right and wrong at the time that he shot Mrs. Robinson. Each of these witnesses was examined out of the presence of the jury and the court declined to allow them to so testify. Summaries of their testimony as it bears upon the question follow:
MALLETTE: The witness saw Alexander two weeks before the killing and said that Alexander was depressed and had said that he contemplated suicide. He saw Alexander again in jail the day after the shooting and said that on that occasion Alexander seemed to have just realized that he had done something wrong.
BRICKELL: Alexander told this witness in 1975 about his affair with Mrs. Robinson and was upset about it. The last time the witness saw Alexander was in August, 1975.
PHILLIPS: Witness met Alexander in June, 1975, and was told by Alexander of his affair with Mrs. Robinson and Alexander seemed unable to get his mind on anything else. She saw Alexander two weeks before the shooting and he appeared uncertain and upset.
TAYLOR: Witness had known Alexander for six or seven years. In the summer of 1975 Alexander was "completely obsessed" with his affair with Mrs. Robinson. He told the witness that he had long contemplated suicide. The last time the witness saw Alexander was on October 2, 1975. She also stated that she had had a long conversation with Alexander some ten days prior to the shooting. Witness neither related any statement nor described any behavior on the part of Alexander which had occurred on either occasion.
VANCE: He had known Alexander since 1959. Alexander was spoiled as a child and *383 was afraid of his father. Witness talked with Alexander in the fall of 1974 and was told by Alexander of his affair with Mrs. Robinson. He also was told that Alexander had thoughts of suicide. The last time witness saw Alexander was on October 1, 1975, at which time Alexander talked of his affair with Mrs. Robinson and said that Mrs. Robinson's husband had hired someone to kill him. Alexander was "nervous and shaking."
LAMAR: Witness had known Alexander for about four years. Alexander was upset about his affair with Mrs. Robinson and about losing his job at the Country Club. Alexander mentioned his thoughts of suicide. Witness said Alexander was afraid of Mr. Robinson, the victim's husband. Although the witness saw Alexander at a party the night before the shooting, he gave no facts or circumstances as to statements or behavior on the part of Alexander on that occasion.
The rule allowing a lay witness to give an opinion as to the mental competency of another was dealt with by this Court in In re Estate of Prine, 208 So.2d 187, 190 (Miss. 1968). In Prine this Court said:
This hypothetical question was asked of other laymen whose answers were to the same effect. These witnesses also admitted during their examinations that they could not tell anything about his mental state at a time when they did not see him. Of course, a layman could not reasonably know the condition of a testator's mind when he did not see the testator. The question propounded was a question for the experts. Certainly it would take an expert to tell from the appearances and actions of a man, observed prior to his entry in the hospital and after his discharge from the hospital, whether the man was competent or incompetent on a certain date between entry and discharge. Several of the witnesses said the testator had lucid intervals. One who was not there could not know, and would not be in a position to know, whether a man who had lucid intervals was lucid or not at a particular time.
.....
As a general rule, the opinion of a non-expert witness as to a person's sanity or soundness of mind, if based on knowledge or observation, may be received; but the opinion may not extend to matters requiring expert knowledge...
A non-expert witness cannot give his opinion regarding sanity based on an abstract hypothetical question... .
An opinion of a lay witness on the question of another's insanity must be limited to the impression made at the time of observation. Ross v. State, 153 Tex.Cr.R. 312, 220 S.W.2d 137 (1949); State v. Douglas, 312 Mo. 373, 278 S.W. 1016 (1925); 23 C.J.S. Criminal Law § 867 at 422 (1961).
Non-expert witnesses cannot be allowed to project the opinion as to the mental condition of accused at a future time. Ross v. State, supra; 23 C.J.S., supra. See also Harvey v. State, Miss., 207 So.2d 108 (Feb. 19, 1968).
Appellant contends that the rule announced in Prine, a civil case, should not be extended to criminal cases. Except where constitutional questions are involved, such as the admissibility of evidence of the fruit of an unlawful search and the like, the rule as to admissibility of evidence is generally the same in criminal cases as in civil. Moreover, in support of the Prine rule, this Court cited two criminal cases: Ross v. State and State v. Douglas, supra.
In Douglas, supra, which was a prosecution for forgery, the Supreme court of Missouri stated:
Counsel for defendant were not satisfied with that, but wanted the witness to testify to what his present opinion was regarding the sanity or insanity of the defendant, two years after he had made such observations. A lay witness, in testifying to such matters, may give an opinion when based upon the facts which he has observed, after stating such facts as far as he can. It is the impression made upon his mind at the time that is important. An opinion conceived at a *384 later time is not the impression received at the time, from facts immediately observed then, but from later and riper knowledge. To say that a lay witness may afterwards, on mature reflection, possibly with expert advice as to the matter, and an analysis of the facts as he has considered them from later experience, express an opinion, puts him in the class of an expert instead of nonexpert witnesses.
(312 Mo. at 399, 278 S.W. at 1024).
In Ross the Court of Criminal Appeals in Texas, held:
Nonexpert witnesses are confined to their opinions only at the time of their observations of the accused person and cannot be allowed to project their opinions as to the mental condition of such accused at a future time... .
A nonexpert insanity witness cannot be allowed to give his opinion on a question of insanity at a future date. To thus allow would place him in the category of an expert.
(153 Tex.Cr.R. at 327, 220 S.W.2d at 146).
In 23 C.J.S. Criminal Law § 867b (1961), the rule is stated thus:
The opinion of the witness on the question of insanity is properly limited to the impression made at the time of observation; nonexpert witnesses cannot be allowed to project their opinions as to the mental condition of accused at a future time.
The correct rule, therefore, is that a lay witness may express an opinion that another is insane only when a sufficient predicate has been laid to establish that: (1) the witness has had a reasonably sufficient opportunity to observe the subject and (2) has noted behavior on his part reasonably indicative of an unsound mind and upon which he bases an opinion that the subject was, at the time of his observation by the witness, of unsound mind. The witness may not make a prognosis or project into some future time an opinion as to the mental condition of the subject nor may he extend it to a date subsequent to the observation. He is limited, in expressing an opinion, to the time when he had the subject under his observation. Moreover, before being permitted to express an opinion, the witness must have articulated specific facts concerning observed behavior on the part of the subject sufficient to serve as a predicate for his opinion, and such observed facts must be of a character capable of forming a reasonable basis for an opinion of insanity.
The testimony of the lay witnesses offered by appellant wholly fails to articulate facts noted in the behavior of Alexander indicating that he was laboring under a delusion of any kind or that his reaction to any of the conditions which confronted him was abnormal or was such as to indicate that he was insane or incapable of distinguishing between right and wrong. On the contrary, in the circumstances of the case, which are undisputed, his reactions can hardly be said to be other than what those of a normal person would have been under similar conditions. It was said that he was "preoccupied" with his affair with Mrs. Robinson; he was upset by his parents' marital troubles; he talked of suicide but made no attempt to commit it; he was upset by the lawsuit brought against him by the victim's husband; he had been spoiled as a child and was afraid of his father; he was afraid of Mrs. Robinson's husband, whom he had wronged, and whom Alexander had further humiliated and insulted by distributing copies of love letters written by Robinson's wife to him, and he was afraid, not unnaturally, that the husband might kill him; he was upset by the loss of his job as life guard, the job by means of which he had established his liaison with Mrs. Robinson. All of the things related by the witnesses were not imaginings or delusions but were facts, and in every case the reaction of Alexander was no more nor less than that of any normal human being who had behaved as Alexander had behaved and who had been found out. There is nothing in the testimony of these witnesses capable of forming a reasonable basis for an opinion that Alexander was insane at the time he shot Mrs. Robinson. *385 Moreover, although two of the witnesses had seen Alexander at a party the night before the shooting, they testified to no facts or circumstances relating to any statement or behavior on the part of Alexander on that occasion other than to say that Alexander had been "edgy" and that this was not unusual.
It is the observation by the lay witnesses of irrational or abnormal behavior on the part of a subject that justifies allowing him to give an opinion on the question of sanity. Laymen who comprise the jury are also capable, upon facts related by such a witness, of forming their own opinion as to the subject's sanity, and the facts and circumstances related by the witness, in order to be sufficient to permit the giving of an opinion of insanity, must be such as are reasonably capable of supporting it. A lay witness, merely because he has known a person over a length of time, may not be allowed to testify that in his opinion such person is insane, where the witness had not observed any act or behavior on the part of the subject reasonably capable of supporting that conclusion. The trial court correctly declined to allow these witnesses to give an opinion that Alexander was insane at the time he shot Mrs. Robinson, first because a sufficient predicate was not laid in their testimony and second, because their statements as to their observations of Alexander's behavior dealt with conduct and demeanor which did not extend to the time Mrs. Robinson was shot. It should be noted also, that following the court's refusal to allow the giving of an opinion by these witnesses that Alexander was insane at the time he shot Mrs. Robinson, the witnesses were not reoffered to testify as to his sanity at the times they had him under observation and had testified about.
They stated no facts capable of affording cogent support for the theory that Alexander was insane. He may have harbored deep resentment and hatred against Mrs. Robinson for having broken off the affair with him, and Alexander may have been afraid of her husband and angry with him for warning him away from his wife and for having brought suit against him. But these things, rather than constituting evidence of insanity, traditionally, and judged by the history of the human race, more often are thought of as motives for murder.
The second contention of appellant relates to an alleged error committed by the trial court in admitting certain testimony of Dr. Baugh, Dr. Collum and Dr. Pollack, expert witnesses for the State, upon the question of Alexander's sanity.
In the course of the trial, the court directed Dr. Pineda, an expert witness for appellant on the issue of insanity, to turn over to the District Attorney certain documents. Dr. Pineda went to his automobile during the noon recess and obtained his file which contained his information in regard to the case. Through inadvertence Dr. Pineda included some letters written by Alexander while in jail to his attorney and which had been given by the attorney to Dr. Pineda for his use in preparing to testify in the case. Copies of these letters were made and given to the State's psychiatrists for their use in preparing for the case.
Dr. Pineda duly testified as an expert witness for the defense and gave it as his opinion that Alexander had been of unsound mind to the extent that he had been incapable of distinguishing right from wrong at the time he killed Mrs. Robinson.
Cross-examined as to the basis for that opinion, Dr. Pineda stated:
A. In the case I am testifying I went to the sources I felt were adequate to give me  to form an impression.
Q. What were those sources?
A. The time I spent with the defendant, the conversations I had with his mother, the testimony from Clare Alexander, reading letters that were sent to defendant's attorney, etc.

On direct examination, Dr. Baugh, an expert witness for the State, gave it as his opinion that appellant knew the difference between right and wrong at the time he shot Mrs. Robinson. On cross-examination it was developed that a part of the basis for *386 his opinion had been one of the letters written by Alexander to his attorney. Appellant objected and asked that Dr. Baugh's testimony be stricken on the ground that the letters were privileged as communications between attorney and client and that appellant had not consented to their use by the State. The trial court overruled the objection and denied the motion, stating his reasons at length.
Dr. Pollack, also an expert witness for the State, testified that he had read the letters and that they had been a basis for his opinion that Alexander had been legally sane at the time of the shooting. The witness also read from the letters on direct examination. Appellant again objected on the ground that they were privileged and the objection was overruled.
The final expert witness for the State was Dr. Collum. This witness testified that he had formed his opinion prior to reading the letters that Alexander had known the difference between right and wrong at the time he shot Mrs. Robinson. The hypothetical question addressed to him by the District Attorney stated, in part, "And based on your review and study of letters and communications of the defendant." Dr. Collum responded by stating that in his opinion Alexander had been legally sane at the time of the homicide.
The State's position is that the letters were not privileged but, even if they were, appellant waived the privilege by submitting them to Dr. Pineda for his use in preparing and giving his testimony that Alexander had been insane, using the letters, among other things, as the basis for the opinion.
The State relies upon City of Laurel v. Upton, 253 Miss. 380, 175 So.2d 621 (1965), a personal injury action. In that case, plaintiff placed on the stand in support of the claim a Dr. Holder, a medical expert. On cross-examination, Dr. Holder revealed that he had used some letters and reports of another doctor, Dr. Bass, who had examined the plaintiff, to arrive at the medical opinion to which he testified. Defendant then attempted to introduce the letters and reports referred to by Dr. Holder and the plaintiff objected to the introduction on the basis that they were privileged because of the physician-patient relationship. The trial court sustained the objection. On appeal, in reversing the decision of the lower court, this Court said:
In this case appellants were not aware that Dr. Holder was basing his opinion in part on reports and letters of Dr. Bass until it was discovered by cross-examination. Under these circumstances we are of the opinion that appellants had the right to cross-examine Dr. Holder relative to these reports and letters and to introduce them into evidence if they so desired. In every case where an expert witness is allowed to express an opinion such witness is subject to cross-examination as to the basis of his opinion. We see no valid reason why any different rule should prevail relative to a medical expert. We are not unmindful of the privileged communications statute, and do not hold that appellants have the right to put Dr. Bass on as a witness and have him testify over objection of appellee. We do hold that appellant had the right to cross-examine Dr. Holder relative to any matters which he used and considered in reaching his findings and to introduce such matters into evidence if they so desired. The trial court was in error in sustaining the objection to this testimony.
(175 So.2d at 625).
We have concluded that, even if the letters were originally privileged, under the circumstances of this case, the privilege was waived by appellant when the letters were given to Dr. Pineda for the express purpose of his use in preparing his testimony and in basing his testimony that Alexander was insane upon the letters. Under the circumstances the State's expert witnesses were entitled to have and to use the information upon which the defense expert had based his opinion, and were entitled to testify as to their opinions, based in part, on the letters.
*387 Appellant next argues that the conviction should be reversed because Alexander's mother was not permitted to testify that he had told her that Dr. Blissard had told him that he should be committed to a mental institution for treatment. Obviously the proffered testimony was pure hearsay. The trial court properly declined to allow this testimony.
Appellant also contends that hypothetical questions propounded to the State's psychiatrists were improper and prejudicial. However, there was no objection to the questions at trial.
Other matters assigned and argued as error, each of which the Court has carefully considered, are found to be without merit. From the whole record it appears that the case was well and fairly tried and that no prejudicial error warranting reversal was committed. The conviction and sentence appealed from must, therefore, be affirmed.
AFFIRMED.
PATTERSON, C.J., ROBERTSON, P.J., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.