**James Bryson MARTIN, Petitioner,**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections, Respondent.**

**Civ. A. No. 65–H–849.**

United States District Court
S. D. Texas,
Houston Division.

Aug. 22, 1966.

---

Clyde W. Woody, Marian S. Rosen, and John P. Farra, Houston, Tex., for petitioner.

Waggoner Carr, Atty. Gen., of Texas, (Sam R. Wilson, Asst. Atty. Gen., of Texas), Austin, Tex., for respondent.

HANNAY, District Judge.

Memorandum and Order:

Petition for Writ of Habeas Corpus. Title 28, U.S.C.A. Section 2241 et seq.

Petitioner is serving a four year sentence for a conviction for bribery. The conviction was in the state district court of Brazos County, Texas, to which it was removed through a change of venue from Harris County, Texas, the scene of the principal transaction. The conviction occurred in January of 1964. It was affirmed in Martin v. State of Texas, Tex.Cr.App., 395 S.W.2d 631 (January 6, 1965), and motion for rehearing was denied by the same Court of Criminal Appeals of Texas in Martin v. State of Texas, 395 S.W.2d, at 635 (February 17, 1965). Petition for writ of certiorari was denied by the Supreme Court of the United States on November 22, 1965, 382 U.S. 928, 86 S.Ct. 307, 15 L.Ed.2d 340. This ruling was accompanied by a memorandum indicating the existence of grave constitutional questions due to the prosecution's use of a Court of Inquiry while the subject matter was under secret grand jury investigation and about which more later. Petition for writ of habeas corpus was filed in this Court on December 9, 1965. A full evidentiary hearing was thereafter granted to fully determine the federal questions that are raised herein. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770. In addition to the full evidentiary hearing and an examination of the documentary evidence presented at the trial and on habeas corpus, the Court has carefully reviewed the transcribed Statement of Facts of the state proceedings involved herein, to-wit, the Court of Inquiry investigation, the hearing on the Motion to Quash the Indictment in the criminal district court of Harris County, Texas, and the eventual trial in the district court of Brazos County, Texas.

## I.

### THE ISSUES PRESENTED

Subject prosecution arose out of suspected irregularities in the conduct of the Probate Court of a then Probate Judge, Clem McClelland, of Harris County, Texas (hereafter Probate Court and Probate Judge). See McClelland v. State of Texas, Tex.Cr.App., 373 S.W.2d 674. The Harris County grand jury investigating the matter was convened in May of 1962. On June 5, 1962, the District Attorney for Harris County, acting in conjunction with Justice of the Peace W. C. Ragan of Harris County (hereafter Justice of the Peace), took the step of convening a Court of Inquiry pursuant to two then operative but since repealed state statutes. These statutes, Articles 886 and 887, Texas Code of Criminal Procedure, provided respectively:

"When a justice of the peace has good cause to believe that an offense has been, or is about to be, committed against the laws of this State, he may summon and examine any witness in relation thereto. If it appears from the statement of any witness that an offense has been committed, the justice shall reduce said statements to writing and cause the same to be sworn to by each witness making the same; and, issue a warrant for the arrest of the offender, the same as if complaint had been made and filed."

"Witnesses summoned under the preceding article who shall refuse to appear and make a statement of facts, under oath, shall be guilty of a contempt of court, and may be fined not exceeding one hundred dollars, and may be attached and imprisoned until they make such statement."

Petitioner's contention is that the Court of Inquiry proceeding itself violated his constitutional rights under the IVth, Vth, VIth and XIVth Amendments to the Constitution of the United States; that this had the eventual effect of denying him a fair trial on the merits

and thereby voids his conviction. More particularly, he contends that:

1. Evidence used by the prosecution *before the grand jury* [1] was improperly obtained either through subpoenas issued as a result of the Court of Inquiry proceeding or subpoenas issued by the District Attorney's office which were void on their face in that they were issued by an assistant district attorney of Harris County who signed the name of the grand jury foreman to each of them.

2. That the effect of the Court of Inquiry proceedings was to usurp and violate the grand jury indictment system as guaranteed by the federal Constitution and as that proceeding was conducted it violated Petitioner's rights under the Vth, VIth and XIVth Amendments.

3. The action of the trial judge of the criminal district court in Harris County in changing venue on his own motion, Article 560, Texas Code of Criminal Procedure, to Brazos County, violated his constitutional rights under the Vth, VIth and XIVth Amendments in that no evidence was introduced to support the change of venue and that the trial court's action denied him a speedy trial in the district wherein the crime was allegedly committed.

4. That extreme and constitutionally impermissible prejudice was caused Petitioner during the eventual trial in Brazos County due to the close and extensive news, radio and television coverage of the Court of Inquiry proceeding.

## II.

### FINDINGS OF FACT

The suspect conduct in the Probate Court centered around its apparent practice of granting a patently disproportionate number of appointments to a limited few individuals to appraise and administer the estates of decedents, to act as guardians, and to treat with matters before the Probate Court. Investigation was to reveal that for a particular eighteen month period some 3,511 such ap-

---

1. Emphasis added throughout.

pointments were made to Petitioner and four other individuals by the Probate Court. (These five men were jointly indicted for bribery; Petitioner was granted a severance.) The remaining 2,225 appointments were distributed to some 257 persons. (Page 28, Trial Statement of Facts, hereafter S/F). In this connection, the Probate Court had come under investigation by the District Attorney's office sometime prior to June of 1962. The matter likewise came under investigation by newspaper reporters. It is not disputed that in April or May of 1962 the reporters and certain members of the district attorney's staff entered into an agreement whereby the reporters would not release the story until the district attorney's office had completed its investigation. Nonetheless, on June 5, 1962, the story was released through the now defunct *Houston Press*.

The Court of Inquiry hearing did not begin until the 14th day of June, 1962. It is evident that the District Attorney's office had knowledge of a certain Tierra Grande, Inc. no later than June 7, 1962. This is shown by a transcription (hereafter Trn.) of an extended conversation on that date between attorneys Dick Putney, Jim Clark, Pete Moore, the District Attorney, and two of his assistants which is of record. This conversation establishes further that a specific check from Richard Putney for $5,000.00 was delivered to Petitioner to be placed in Tierra Grande, Inc. under instructions from the Probate Judge. Putney further agreed that the investigators could check his bank records at the Citizens State Bank in Houston. (p. 18, Trn.) Thus the location of the Tierra Grande, Inc. bank account was made apparent once the investigators saw a copy of Putney's check at the Citizens State Bank. This interview further made known the existence of Southwest Equities and Bayou Production Company, in which Petitioner was also materially concerned.

Prior to the hearing, at least six grand jury subpoenas had been issued under the name of the foreman of the grand jury which related to the transactions under investigation. These included a subpoena to a female person in the office of the Probate Judge dated June 6, 1962 (Petitioner's Exhibit No. 69); a subpoena to the bookkeeper and custodian of the records of the Bank of the Southwest of Houston relating to checks and deposit slips of the Probate Judge and his wife as of 1948 and dated June 4, 1962 (Petitioner's Exhibit No. 75); a subpoena to the vice-president and cashier and to the bookkeeper and custodian of the records of the National Bank of Commerce to produce the banking records of the Petitioner as of 1957 and dated June 1, 1962 (Petitioner's Exhibit No. 83); a subpoena to the bookkeeper and custodian of the records of the Bank of the Southwest of Houston to bring the banking records of the Probate Judge and his wife as of January 1, 1958 and dated June 7, 1962 (Petitioner's Exhibit No. 85); a subpoena to the bookkeeper and custodian of the records of Highland Village State Bank of Houston to bring the banking records of Tierra Grande, Inc. (Petitioner's Exhibit No. 87); a subpoena to the bookkeeper and custodian of the records of the Bank of the Southwest of Houston to bring forth the banking records of the Probate Judge and his wife as of 1945 and dated June 11, 1962 (Petitioner's Exhibit No. 92).

That proof that checks, deposit slips, and other documents complained of were obtained before commencement of the Court of Inquiry hearing is shown by the following instances:

Jerry O'Brien's attorney mentioned at the opening of the Inquiry that O'Brien's bank records had been subpoenaed. (p. 17, C/I).

The District Attorney revealed his knowledge that certain specific checks had been written on the Tierra Grande, Inc. bank account to pay the expenses of the Probate Judge. (pp. 77–79, C/I).

The District Attorney showed Petitioner a copy of a $3,000.00 check from the latter's bank account at the National Bank of Commerce. (pp. 242–243, C/I).

The District Attorney exhibited to Petitioner a copy of his bank records. (p. 243, C/I).

The District Attorney showed Petitioner a copy of one of his checks for $2,800.00. (pp. 244–246, C/I).

The District Attorney exhibited to Herman Mead copies of deposit slips and checks from Mead's account at the Citizens State Bank. (pp. 366–368, C/I).

The District Attorney exhibited to Helen Smith copies of a number of checks from the account of Tierra Grande, Inc. at the Citizens State Bank (p. 396–398, C/I).

Richard Putney was shown a copy of a check drawn on the Citizens State Bank by the Currie Estate to the order of Southwest Equities Corporation. (p. 464, C/I).

The District Attorney showed Richard Putney copies of a deposit slip reflecting the deposit of $5,000.00 from Putney to Tierra Grande, Inc. (p. 469, C/I).

As the foregoing illustrates, a careful review of the record reveals that information of which Petitioner complains and virtually all of the evidence establishing the crime had been obtained before testimony began at the Court of Inquiry. Except for the records of Tierra Grande, Inc. obtained from Petitioner, the documentary evidence complained of consisted substantially of records of the several banks. *These records belonged to the several banks rather than to Petitioner.*

The records of Tierra Grande, Inc. were brought into the Court of Inquiry by a subpoena duces tecum issued to the Petitioner by the Justice of the Peace on June 15, 1962. (p. 227, Hearing on Motion to Quash Indictment, Defense Exhibit No. 3). Petitioner, by his own admission, was both the President of Tierra Grande, Inc. (p. 174, C/I) and its registered agent. (p. 176, C/I). The record reveals that it was known at the time that the Probate Judge was interested in Tierra Grande, Inc. This subpoena duces tecum required Petitioner, as President and agent of the corporation, to bring forth its records. The record

further shows that Petitioner had an opportunity to confer with his attorney before producing the corporate records. (p. 255, C/I). Nor was Petitioner able to answer some of the questions concerning Tierra Grande, Inc. without referring to the records. (p. 175, C/I).

Petitioner and other witnesses before the Court of Inquiry were permitted to have counsel present. Under the general principle that the proceeding was investigatorial rather than adjudicative, the Petitioner and other witnesses were compelled under penalty of contempt to take the witness stand. Nonetheless, *the Vth Amendment privilege against compulsory self-incrimination was observed* by the presiding Justice of the Peace. This is illustrated by the following instances of record:

The Court upheld the Probate Judge in his refusal to answer to a particular question. (p. 55, C/I).

The Court stated that the witness could decline to answer if he wanted to. (p. 67, C/I).

The Court again told the witness that he could refuse to answer if he wanted to. (p. 98, C/I).

The Court told the witness he was not compelling him to testify. (pp. 127–128, C/I).

The Court stated that the witness could invoke the Vth Amendment in respect to particular questions as they were propounded. (p. 131, C/I).

The Court stated that the witness could answer the question or not as he wished. (pp. 156–157, C/I).

The Court advised the witness that he could decline to answer specific questions on the ground that they would tend to incriminate him. (p. 437, C/I).

### III.

CONCLUSIONS OF LAW CONCERNING ALLEGED DEPRIVATION OF CONSTITUTIONAL RIGHTS INCIDENT TO THE CONDUCT OF THE COURT OF INQUIRY

■ 1. The books and records in question were reached by subpoenas in a limited investigatorial proceeding or

proceedings rather than as a result of an illegal search. The landmark cases in the field of searches and seizures—old and new—are therefore inapposite here. In Silverthorne Lumber Company v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, the illegal evidence resulted basically from a warrantless search and seizure of corporate records which could not be cured by subsequently issued subpoenas based upon the vitiated information. *There was no search and seizure here; and there is ample evidence in the record that crucial information had come from independent sources.* 251 U.S., at 392, 40 S.Ct. 182. For the same reasons the more recent pronouncements in this field, Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503; Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726; Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, do not apply on the facts of the case. Vitiating circumstances on this point, if they exist, must be found in the convening or conduct of the then statutorily authorized investigation itself.

■ 2. *In the range of constitutional permissiveness a clear distinction exists between a mere investigatory proceeding on the one hand and a judicial or adjudicatory one on the other.* In re Groban, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376; Anonymous Nos. 6 and 7 v. Baker, 360 U.S. 287, 79 S.Ct. 1157, 3 L.Ed.2d 1234; Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307. *Groban* and *Baker* both involved investigatory proceedings authorized by state statutes. In *Groban* the Ohio statute authorized the state Fire Marshal to conduct an investigation into the cause of a fire and to exclude from the investigation unrequired persons. The Fire Marshal refused to permit appellants' counsel to be present at the proceeding. Appellants declined to be sworn or to testify and, acting under the statute, the Fire Marshal committed them to jail until such time as they were willing to testify.

Upholding constitutionality on the squarely presented issue of excluding counsel from the investigation, the United States Supreme Court stated with relevancy to instant case:

" * * * The fact that appellants were under a legal duty to speak and that their testimony might provide a basis for criminal charges against them does not mean that they had a constitutional right to the assistance of their counsel. * * * Obviously in these situations evidence obtained may possibly lay a witness open to criminal charges. When such charges are made in a criminal proceeding, he then may demand the presence of his counsel for his defense. *Until then his protection is the privilege against self incrimination.* * * * This is a privilege available in investigations as well as in prosecutions. * * * We have no doubt that the privilege is available in Ohio against prosecutions as well as convictions reasonably feared. * * * The mere fact that suspicion may be entertained of such a witness, as appellants believed existed here, though without allegation of fact to support such a belief, does not bar the taking of testimony in a private investigatory proceeding." (Citations omitted)

In *Baker* the appellants were licensed private detectives and investigators who were convicted of contempt for refusal to answer pertinent questions put to them as witnesses summoned before a New York judge. The inquiry was pursuant to an appellate court order based upon a state statute. The investigation was a non-adversary, non-prosecutorial preliminary fact finding proceeding into alleged unethical practices of attorneys and others acting in concert with them. The appellants did not plead the state privilege against self-incrimination but based their refusal to testify solely on the fact that their counsel was required to remain outside the hearing room while they were being interrogated. The claim of unconstitutionality was rejected by the

Supreme Court which held that the case came clearly within the *Groban* principle.

Hannah v. Larche, supra, involved the investigatorial powers of a federal agency, the Commission on Civil Rights which was created in the Executive Branch of the government by the Civil Rights Act of 1957. Authorizing the Commission's investigation into written and sworn allegations of discrimination in respect to the right to vote, and further authorizing the Commission to subpoena witnesses and documents and to hold hearings, the Act made no provision for notifying accused persons of the charges against them, for revealing the identity of the accusers, for granting the right of confrontation, or for cross-examination of witnesses. Acting pursuant to the Act, the Commission prescribed supplemental procedural rules denying such rights at its hearing. First determining the existence of authorization in the Act itself, the Supreme Court then reached the substantive constitutionality of the procedural rules themselves. Again, the ultimate question was whether the Commission's function was investigative or adjudicatory. The function of the Commission was to *investigate, ascertain and report facts rather than to adjudicate, fix and determine legal rights.* The procedural rules of the agency were deemed constitutional.

Petitioner's reliance on Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923, on the question of confrontation and cross-examination at the Court of Inquiry hearing is unavailing. *Pointer* was a state felony prosecution and adversary proceeding involving instant legal jeopardy to the accused. On the contrary, the tenor of *Pointer* and the judicial trend that it augments would support the proposition that the pertinent standards for federal agency investigations would apply equally in a legally analogous state proceeding.

■■ Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (June 22, 1964) and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199,

12 L.Ed.2d 246, are likewise inapposite. In light of *Groban* and *Baker* they clearly do not condemn a purely investigatory proceeding wherein the privilege against self-incrimination was respected and counsel was allowed to be present. Moreover, although the point is unnecessary to the resolution of this particular issue, *Escobedo* is not retroactive, Johnson (Cassidy) v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed. 2d 882 (June 20, 1966), and instant trial began before the determinative date of June 22, 1964.

Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, which promulgates the enforceability of the federal standard for the Vth Amendment privilege against self-incrimination in a state proceeding, is strongly relied on by Petitioner. But again instant case is distinguishable because the privilege was respected generally at the Court of Inquiry and specific instances of its denial, as occurred in Malloy v. Hogan, are neither alleged nor apparent from the record.

Gideon v. Wainright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, involving the right to representation by counsel in a state felony prosecution, was not violated in the non-adjudicatory proceeding here in question.

3. On the constitutional validity of the indictment and integrity of the grand jury deliberations as affected by the Court of Inquiry proceedings:

■ A positive and specific showing of grand jury prejudice must be made where the indictment process is attacked on grounds of adverse publicity in the community. Beck v. Washington, 369 U.S. 541, 545–555, 82 S.Ct. 955, 8 L.Ed. 2d 98; United States v. Hoffa, D.C., 205 F.Supp. 710, 717.

In Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397, the United States Supreme Court rejected the proposition that a grand jury indictment could be attacked on grounds of inadequate or incompetent evidence. Although the evidence there was allegedly hearsay and that here is deemed compe-

tent, the following passage in the Supreme Court's opinion is apropos:

" * * * If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." 350 U.S. 363, 76 S.Ct. 406, 408.

█ Indeed, the preliminary criminal accusatorial procedures of the several states have not traditionally been subject to federal standard interposition under the XIVth Amendment. Hurtado v. People of State of California, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232; McNulty v. People of State of California, 149 U.S. 645, 13 S.Ct. 959, 37 L.Ed. 882; Lem Woon v. State of Oregon, 229 U.S. 586, 33 S.Ct. 783, 57 L.Ed. 1340; Beck v. Washington, supra, 369 U.S. at 545, 82 S.Ct. 955.

█ I find that Petitioner has not shown that the grand jury in this case was prejudiced against him as a result of the newspaper, television and radio coverage that attended the Court of Inquiry proceeding. I conclude that no federal constitutional issue is presented under this contention by the facts developed herein.

4. On the constitutionality of the change of venue from Harris County and the conduct of the trial in Brazos County in light of the publicity that attended the Court of Inquiry and the indictment of Petitioner:

█ The complained of action of the Harris County criminal district judge in changing venue on his own motion to Brazos County was based on Article 560, Texas Code of Criminal Procedure, which authorizes this where in his opinion neither the state nor the defendant could receive a fair trial in the county of original venue. This statutorily authorized decision of a trial judge would ordinarily be a matter of appellate rather than collateral review. In any case, there was ample evidence within the judicial knowledge of the Harris County criminal district judge on this point to eliminate any suggestion of an infraction of constitutional dimension. Nor is there merit in the contention that it had the effect of denying Petitioner a speedy trial in the district of the alleged crime in violation of his federal constitutional rights.

█ I further find that there was no prejudice of constitutional dimension in Petitioner's trial in Brazos County. *The trial took place some eighteen months after the Court of Inquiry.* Bryan, Texas, the location of the eventual trial, is approximately 100 miles from Houston where the complained of transactions occurred. Instant case is materially distinguishable from the recent case of Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543. There, the objectionable television radio and newspaper coverage occurred on the trial date and continued through the two days it took to determine the motion to exclude them from the trial. In *Estes* telecasting of portions of the trial proper was permitted. Here, the Court of Inquiry was *a separate, distinct and collateral proceeding crucially removed in point of time and place from the eventual trial.* Compare Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543, where, unlike here, the state corrective processes of continuances and change of venue were not employed to effectively counter local prejudice. While Bryan is within range of a substantial portion of the public news media emanating from Houston, the record and the evidence received at the hearing fail to show that Petitioner could not, or did not, receive a fair trial due to

adverse publicity attendant upon the Court of Inquiry proceeding. It is a material fact on the point of alleged trial prejudice that Petitioner received less than the full authorized punishment for bribery which is five years. Art. 158, Vernon's Ann.Texas Penal Code. It is likewise significant that in the trial in Brazos County the able counsel who represented Petitioner there as well as in this proceeding apparently did not contend that there was undue or prejudicial publicity in that trial. See Martin v. State, supra.

5. I conclude that the trial and conviction of Petitioner in Brazos County was constitutionally unaffected by the Court of Inquiry proceedings.

For the foregoing reasons, the Petition for Writ of Habeas Corpus should be, and it is hereby, denied.

The foregoing shall constitute findings of fact and conclusions of law.

This is and constitutes a final judgment herein.

The Clerk will notify Petitioner's counsel and the Attorney General of Texas.