**James Bryson MARTIN, Appellant,**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections, Appellee.**

**No. 24672.**

United States Court of Appeals
Fifth Circuit.

June 18, 1968.

Rehearing Denied Aug. 14, 1968.

Clyde W. Woody, Marian S. Rosen, Houston, Tex., for appellant.

Lonny F. Zwiener, Howard Fender, Asst. Attys. Gen., Austin, Tex., for appellee.

Before RIVES, GEWIN and THORNBERRY, Circuit Judges.

RIVES, Circuit Judge:

This appeal from the district court's denial of habeas corpus stems from the Probate Court scandal that rocked Houston, Texas, in 1962, and presents some important constitutional questions.

The appellant Martin was convicted of bribery, sentenced to imprisonment for four years and fined $2500.00. His conviction was affirmed by the Court of Criminal Appeals of Texas.[1] Certiorari was denied by the Supreme Court of the United States accompanied by the following significant memorandum of the Chief Justice:

"Memorandum of Mr. Chief Justice Warren.

"Each of these three cases stems from the following factual setting:

"The Grand Jury of Harris County, Texas, was impaneled on May 7, 1962, to investigate irregularities in the administration of the Probate Court. While Grand Jury sessions were proceeding, the District Attorney of the County, in cooperation with the Justice of the Peace, took the virtually unprecedented step of obtaining an order to institute a 'Court of Inquiry.'

"This body, formerly sanctioned by Vernon's Texas Code of Criminal Procedure, Arts. 886, 887, permits a justice of the peace to summon and examine witnesses and take sworn testimony. Those who fail to comply with his summons or refuse to make statements under oath may be fined and im-

---

1. Martin v. State, 1965, Tex.Cr.App., 395 S.W.2d 631.

prisoned. From the year of its enactment—1876—to this date, it appears that the procedure had been seldom invoked.

"The secret Grand Jury deliberations were postponed while the District Attorney pursued the Court of Inquiry publicly, in front of the press, radio recorders and television cameras. In this inflamed atmosphere, the petitioners were questioned for some four days, although they objected to testifying. They were not permitted to consult with their attorneys during the proceedings, to defend themselves, to cross-examine or confront the witnesses against them, to call witnesses on their behalf, to rebut or to contradict the evidence produced by the prosecution. Two days later, the Grand Jury was reconvened and brought in indictments against the petitioners.

"Due to a change of venue and continuances secured by the petitioners, their trials did not take place until more than two years later in a neighboring county. Their pretrial motions to quash the indictments were denied, in two cases without hearings, and they were found guilty of the offenses charged.

"The Texas Legislature has since repealed the 'Court of Inquiry' proceeding through the adoption of a new Code of Criminal Procedure, Laws, 1965, 59th Leg. Reg. Sess., c. 722, to become effective January 1, 1966. Under the new Code, no justice of the peace may convene a Court of Inquiry. Rather, they may be conducted only by district judges, and all witnesses are entitled to the same protections as in felony prosecutions. Arts. 52.01–06.

"It is clear that grave constitutional questions are raised by conducting such a proceeding. See, e. g., Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543; Moore v. Dempsey, 261 U.S. 86, 90–91, 43 S.Ct. 265, 266, 67 L.Ed. 543. Against the background of the factors mentioned above,

the Court has declined review. Our denial of the petitions for certiorari in these cases should not be taken in any way as sanctioning the proceedings or of approving of the judgments below. It means only that for one reason or another these cases did not commend themselves 'to at least four members of the Court as falling within those considerations which should lead this Court to exercise its discretion in reviewing a lower court's decision.' Memorandum of Mr. Justice Frankfurter, Sheppard v. State of Ohio, 352 U.S. 910, 911 [77 S.Ct. 118, 1 L.Ed.2d 119]; see also, Maryland v. Baltimore Radio Show, Inc., 338 U.S. 912, [70 S. Ct. 252, 94 L.Ed. 562]."

Martin v. Texas, 1965, 382 U.S. 928, 929, 86 S.Ct. 307, 15 L.Ed.2d 340.

Thereafter, Martin filed in the Court of Criminal Appeals of Texas a motion to vacate the judgment, urging reconsideration in the light of Chief Justice Warren's memorandum and of certain recent decisions of the United States Supreme Court. That motion was overruled on December 1, 1965, and Martin began the service of his sentence on December 9, 1965.

On the same date, Martin filed in the federal district court his petition for habeas corpus. A plenary hearing was had from January 3 to January 12, 1966. On August 22, 1966, the district court entered full findings of fact and conclusions of law[2] and denied the writ of habeas corpus.

On appeal the claimed errors are stated by Martin in his "Specifications of Error" as follows:

"SPECIFICATION OF ERROR NUMBER ONE

"The District Court erred in denying Appellant's Petition for Writ of Habeas Corpus in that:

"A. Appellant's State court conviction was based upon evidence utilized by Appellee State of Texas which was obtained as a result of subpoenaes is-

2. Reported as Martin v. Beto, S.D.Tex.1966, 260 F.Supp. 589–598.

sued either by the District Attorney's office of Harris County, Texas, which were void on their face, or through subpoenas issued as a result of the Court of Inquiry process system, both of which were violative of Appellant's rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

"B. Appellant was denied in his State trial, the protection guaranteed to all individuals by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States, when the Criminal District Court Number Five of Harris County, Texas, wherein the crime charged was alleged to have occurred and wherein the indictment was returned, took the opinion itself, without considering any evidence, and over Appellant's objection, to change the venue of the case to another County in Texas under color of authority, Article 560, Vernon's Annotated Code of Criminal Procedure of Texas, 1925, and where the resulting change of venue was to the extreme prejudice of the Appellant, there being a vast and close coverage of the Court of Inquiry proceedings and previous trials by courts involved in the Court of Inquiry, permeating Brazos County, Texas, located less than one hundred miles from Harris County, Texas, with substantially all necessary facilities in Harris County, Texas, substantially covering Brazos County, Texas, and with Appellant's good reputation in Harris County, Texas, being unavailable to him in Brazos County, Texas.

"C. The Court of Inquiry procedures utilized by Appellee State of Texas, acted to effectively replace the Grand Jury indictment system guaranteed to Appellant by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

"SPECIFICATION OF ERROR
NUMBER TWO

"The District Court erred in admitting into evidence, over proper objec-

tions, a transcript which accompanies Appellees' Motion to Reopen Evidence."

For convenience we restate the questions presented on appeal:

1. Did the district court err in overruling Martin's objections to the transcript which accompanied appellee's motion to reopen evidence?

2. Was evidence against Martin unconstitutionally obtained as a result of grand jury subpoenas issued by an assistant district attorney who signed the name of the grand jury foreman?

3. Was evidence against Martin unconstitutionally obtained through subpoenas issued by the Court of Inquiry?

4. Were the Court of Inquiry procedures in fact utilized by the State of Texas to replace or violate the grand jury indictment system?

5. Did the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States guarantee to Martin a right to be tried on indictment of a grand jury?

6. Did the Sixth and Fourteenth Amendments to the Constitution of the United States secure to Martin a right to be tried in the county in which the crime was alleged to have been committed?

7. Did the action of the State court in sua sponte ordering a change of venue from Harris County to Brazos County violate any federal constitutional rights of Martin?

8. Did the publicity attending the Court of Inquiry proceedings unconstitutionally deprive Martin of a fair trial in Brazos County?

We shall briefly discuss the eight questions in that order.

1. The evidence originally was closed on the plenary hearing in the district court on January 12, 1966. Subsequently on March 4, 1966, the respondent filed a motion to reopen the evidence for the purpose of introducing additional evidence as to the knowledge possessed by the district attorney, prior to the Court of Inquiry, of the evidence upon which Martin was convicted. That additional evidence

consisted of a 61-page transcription of 10 dictaphone belts recording conversations on Friday, June 7, 1962, a week before the opening of the Court of Inquiry, between three attorneys, Dick Putney, Jim Clark and Pete Moore and the District Attorney and three Assistant District Attorneys. Martin objected because there was no showing as to why, by the exercise of due diligence, this evidence could not have been offered before the evidence at the habeas hearing was closed. The district court overruled that objection and admitted the transcription in evidence.

At that time no order had been entered nor had the briefs of the parties been filed. There appeared no possibility of wrongful prejudice to Martin by allowing the reopening of the evidence for this limited purpose. Whether the case should be reopened for receipt of this evidence was peculiarly within the discretion of the district court and we find no abuse of discretion.[3]

2. Copies of the grand jury subpoenas appear not to have been kept on file in regular course. Most of those which could be located and introduced on the habeas hearing were signed in the name of E. Jack Walton, Foreman of the Grand Jury, followed by initials which would indicate that they were actually signed by an assistant district attorney. On this question the parties have cited no authorities. It is stated in 38 C.J.S. § 41b, pp. 1050, 1051:

" * * * a very usual practice is that the prosecuting attorney should have such witnesses summoned as he believes necessary to support the bills to be laid before the grand jury, although it has been held that a district attorney has no power to issue a subpoena for appearance of a witness before the grand jury without the latter's direction."

In the absence of more evidence than appears in this case that the use of one or more of such subpoenas amounted to an unreasonable search and seizure of which Martin can complain, or required Martin to give evidence against himself, we cannot hold that the practice violates the Federal Constitution.

3. As to the subpoenas issued by the Court of Inquiry, the record sustains the finding of the district court that most of the evidence obtained from Martin consisted of corporate records of Tierra Grande, Inc., which were not privileged, and of checks and bank records of which the district attorney already had knowledge from independent sources. The most notable exceptions are three yellow tablet sheets containing pen-and-ink figures of various amounts opposite the names of Martin and of others claimed to be parties to the bribery and misuse of funds, Petitioner's Exhibits 37, 38 and 39. Mr. Zgourides, an Assistant District Attorney, admitted that these were used by the prosecution at appellant's trial. The record clearly discloses, however, that the Justice of the Peace in conducting the Court of Inquiry actually allowed any witness to assert his Fifth Amendment privilege against self-incrimination. Martin had the benefit of his counsel's advice before responding to the subpoena duces tecum. His counsel was not permitted to advise him during the course of his testimony but was present. Martin was himself a lawyer. If he had claimed his Fifth Amendment privilege against the production of these exhibits or of any other evidence, there is every indication that such claim would have been respected. No such claim having been made, we find no breach of Martin's constitutional rights as a result of any evidence produced before the Court of Inquiry.

4. and 5. The grand jury had been convened in May 1962 and had started its inquiry into the conduct of the Probate Judge, the probate scandal and irregularities, but as to Martin there appears no reason to doubt the testimony of the district attorney that, "I'm saying that nothing remotely connected with your

---

3. See 6A Moore's Federal Practice, 2nd ed., ¶ 59.04 [13].

petitioner had been considered by the Harris County Grand Jury prior to the Court of Inquiry."

Any legitimate purpose of the Court of Inquiry seems best explained in the testimony of Assistant District Attorney Dally:

"Q. Now, Mr. Dally, the purpose of the Court of Inquiry then was to find out how many people were involved in this probate scandal, is that correct, to explore the scope of it?

"A. Yes, I think that would be a fair statement of it.

"Q. And although you had knowledge that the petitioner, Mr. Martin and certain others, were involved in this and you had a pretty good idea of their involvement, you had hoped that the Court of Inquiry would develop evidence as to how many other people were involved and what their involvement was, is that correct?

"A. Well, I don't know. I would say hope, because we didn't want to find anybody else in it, but if there was anybody else involved in it, we wanted to find out, yes sir.

"Q. And isn't it also a fair statement that you did not expect to find only evidence of bribery in this investigation of the probate court scandal—

    \*    \*    \*    \*    \*    \*

"Q. (By Mr. Wilson) And also, Mr. Dally, you also expected—hoped that you would find some evidence that there had been some out-and-out theft from some of of these estates, isn't that right?

"A. Yes, and the documents we had from all the various estates and telephone calls even to Canada indicated. We didn't know.

    \*    \*    \*    \*    \*    \*

"Q. (By Mr. Wilson) So, in other words, the purpose of the Court of Inquiry, then, was not simply to gather evidence against James Bryson Martin and Mr. Coffee and Mr. Evahn and Mr. Hudson and the other defendants that were on the indictment—

"A. I would say no. It was to determine whether or not, whether they were involved in criminal activity and whether others were in the extent and scope of it, yes sir."

■ In the present state of the law, the grand jury requirements of the Fifth Amendment are held not binding on the states by virtue of the Fourteenth Amendment. Hurtado v. People of State of California, 1884, 110 U.S. 516, 538, 4 S.Ct. 111, 28 L.Ed. 232; Kennedy v. Walker, 1949, 337 U.S. 901, 69 S.Ct. 1046, 93 L.Ed. 1715, rehearing denied, 337 U.S. 934, 69 S.Ct. 1493, 93 L.Ed. 1740; Beck v. Washington, 1962, 369 U.S. 541, 545, 579, 82 S.Ct. 955, 8 L.Ed.2d 98; Malloy v. Hogan, 1964, 378 U.S. 1, 4, n. 2, 84 S. Ct. 1489, 12 L.Ed.2d 653.

The District Attorney testified that two of the grand jurors were sitting in the audience one afternoon while the Court of Inquiry was being conducted. He could not recall whether that was during the time that Martin was being interrogated. The wide publicity given to the Court of Inquiry proceedings by television, radio and the newspapers leaves little or no doubt that most or all of the grand jurors were informed of those proceedings.

■ Nonetheless, under the cases last cited, the method of investigation of the alleged crime and the bringing of charges against those accused were matters peculiarly within the province of the State of Texas. We find no unconstitutional replacement or violation of the grand jury indictment system.

■■ 6. and 7. Martin was a resident citizen of Harris County, Texas, and he was charged with having committed a crime in that County. Venue was initially and properly laid in Harris County. See Art. 13.26, Tex.Code of Crim.P. The power to change venue is vested in the

courts by the Texas Constitution, Art. 3, § 45; see Tex.Code of Crim.P., § 31.01 et seq.

No evidence was introduced supporting a change of venue, but the Texas court on its own motion, and over Martin's objection, entered an order changing the venue. The order provided in part:

"And it appearing to the satisfaction of the Court that a trial alike, fair and impartial to the accused and the State can not be had in this Harris County .because there exists in this County so great a prejudice against the defendant James Bryson Martin;

\* \* \* \* \* \*

"And it appearing to the Court and the Court finding that there exists in all counties adjoining this county the same valid objection as to prejudice that exists in Harris County, the Court, upon its own motion, orders that venue of this cause be and the same is hereby changed to Brazos County, Texas \* \* \*."

The Texas Court of Criminal Appeals disposed of Martin's objection to change of venue as follows:

"Complaint is also made to the court's action in ordering venue changed to Brazos County. Appellant does not present by either formal or informal bill of exception any facts which refute the court's finding that a fair and impartial trial to both appellant and the state could not be had in Harris County. In the absence of such proof it will be presumed, on appeal, that the court had a basis for such finding, and no error is shown. Ross v. State, 153 Tex.Cr.R. 312, 220 S.W. 2d 137."

Martin v. State, Tex.Crim.App.1965, 395 S.W.2d 631, 634.

As to this objection, the federal district court found as follows:

"On the constitutionality of the change of venue from Harris County and the conduct of the trial in Brazos County in light of the publicity that attended the Court of Inquiry and the indictment of Petitioner:

"The complained of action of the Harris County criminal district judge in changing venue on his own motion to Brazos County was based on Article 560, Texas Code of Criminal Procedure, which authorizes this where in his opinion neither the state nor the defendant could receive a fair trial in the county of original venue. This statutorily authorized decision of a trial judge would ordinarily be a matter of appellate rather than collateral review. In any case, there was ample evidence within the judicial knowledge of the Harris County Criminal district judge on this point to eliminate any suggestion of an infraction of constitutional dimension."

Martin v. Beto, S.D.Tex.1966, 260 F. Supp. 589, 597.

█ This Court accepts the findings of the district court and of the State courts that Martin could not have had a fair and impartial trial in Harris County. In our view, however, the critical question goes deeper and requires a consideration of the State's responsibility for the reasons which denied Martin a trial in Harris County. If the State brought about the conditions which made necessary the change of venue, was the State's conduct justifiable? If not, was Martin's right to be tried in Harris County of such importance that the State's conduct in wrongfully depriving him of that right amounted to a denial of due process of law under the Fourteenth Amendment?

Our examination of the voluminous record and exhibits leaves us in no doubt that the unprecedented publicity which attended the Court of Inquiry gave rise to "so great a prejudice against the defendant James Bryson Martin" that he could not get a fair trial in Harris County. Nor do we have any doubt that the State actively aided and abetted that publicity.

Whether any excuse or justification existed for that publicity presents a more difficult question. The probate court

scandal involved investigations of nearly six thousand estates of decedents. The cooperation of many more thousand beneficiaries may have proved helpful in determining the extent of the misconduct and wrongdoing and the number of people involved in criminal activity. The matter was of extraordinary public interest and importance. The full light of publicity may have been helpful to restore the confidence of the people in their probate court system. Under all of the circumstances, we are of the opinion that the State's conduct did not *wrongfully and illegally* deny Martin the right to be tried in Harris County. By way of precaution, however, we will assume the contrary and inquire whether such denial is of constitutional proportions.

■ That part of the Sixth Amendment which gives the accused the right to a trial "by an impartial jury of the State and district wherein the crime shall have been committed" has not thus far been held applicable to the States. See United States ex rel. Chatary v. Nailon, E.D.Pa.1962, 211 F.Supp. 676, 678. That is true also as to the requirement of Article 3, Section 2, Clause 3 of the Constitution that the trial of all crimes "shall be held in the State where the said crimes shall have been committed." However, an accused in a State court, no less than an accused in federal court, is affected by "the unfairness and hardship to which trial in an environment alien to the accused exposes him." United States v. Johnson, 1944, 323 U.S. 273, 275, 65 S.Ct. 249, 250, 89 L.Ed. 236. The common-law rule that criminal prosecutions shall be tried in the county or district in which the offense was committed is "shrouded in antiquity." United States ex rel. Chatary v. Nailon, supra, 211 F. Supp. at 698. It has been embodied in the constitutions or statutes of many states. 22 C.J.S. Criminal Law § 176, p. 433, n. 36. It is more than a matter of formal legal procedure and touches "closely the fair administration of criminal justice and public confidence in it, on which it ultimately rests." United States v. Johnson, supra, 323 U.S. at 276,

65 S.Ct. at 250. See also Travis v. United States, 1961, 364 U.S. 631, 634, 81 S.Ct. 358, 5 L.Ed.2d 340. "The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." United States v. Cores, 1958, 356 U.S. 405, 407, 78 S.Ct. 875, 877, 2 L.Ed.2d 873.

Thus, whether the State's conduct in making necessary a change of venue has deprived Martin of his liberty without due process of law is a question of extreme difficulty and gravity. If decided in the affirmative, there is some doubt as to whether he could ever be legally tried.

■ The county seat of Brazos County where the trial took place is approximately one hundred miles from Houston where the crime was alleged to have been committed. We conclude that if, in fact, Martin received a fair trial in Brazos County, the State's conduct in making necessary a change of venue did not deprive him of his liberty without due process of law.

8. We come then to the final question, did the publicity attending the Court of Inquiry proceedings unconstitutionally deprive Martin of a fair trial in Brazos County?

■ Martin's trial in Brazos County took place in January 1964. His judgment of conviction is dated January 16, 1964. The Court of Inquiry had been held in June 1962. Some eighteen months intervened between the holding of the Court of Inquiry in Houston and Martin's trial in Bryan. The district court found that,

"While Bryan is within range of a substantial portion of the public news media emanating from Houston, the record and the evidence received at the hearing fail to show that Petitioner could not, or did not, receive a fair trial due to adverse publicity attendant upon the Court of Inquiry proceeding."

260 F.Supp. at 597, 598. The appellant urges that the district court should have applied the burden declared in Chapman v. State of California, 1967, 386 U.S. 18,

23, 87 S.Ct. 824, 17 L.Ed.2d 705, and could have ruled against Martin only on a finding that the adverse publicity attendant upon the Court of Inquiry proceeding was harmless beyond a reasonable doubt. Such a burden would have to rest on the premise that the Court of Inquiry or its attendant publicity, in and of itself, constituted a breach of Martin's constitutional rights. The district court held that, "In the range of constitutional permissiveness a clear distinction exists between a mere investigatory proceeding on the one hand and a judicial or adjudicatory one on the other." 260 F.Supp. at 595. We agree with that part of the district court's opinion and with its able discussion of the applicable decisions, and hold that the district court properly imposed the burden on Martin to prove that he did not receive a fair trial due to the adverse publicity attendant upon the Court of Inquiry proceeding. That is especially true in view of the change of venue and of the eighteen-month period which intervened between the Court of Inquiry and Martin's trial in Brazos County.

Adverse publicity as affecting a fair trial has been the subject of a number of recent decisions of the Supreme Court, such as: Marshall v. United States, 1959, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250; Irvin v. Dowd, 1961, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751; Rideau v. State of Louisiana, 1963, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 63; Estes v. State of Texas, 1965, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, and Sheppard v. Maxwell, 1966, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600. Those cases emphasize the power and the duty of the courts to insure that a fair trial by an impartial jury is afforded every criminal defendant. That duty rested on the court in Brazos County, Texas, before which Martin was tried and that court had full power to take such steps in the selection of the jury, in the fixing of the time of trial, and in taking other precautions to insure that Martin was not prejudiced by the publicity before the Court of Inquiry then some eighteen months past. There was no complaint on appeal that the trial court had failed in any way to perform its duty in that respect. Martin v. State, Tex.Crim.App.1965, 395 S.W.2d 631. No such complaint was made on the habeas hearing.

The nature of the adverse publicity of the Court of Inquiry proceedings does not approach in prejudicial effect that of the pre-trial publicity in Rideau v. State of Louisiana, supra, for Martin made no statement in the nature of a confession. In our opinion, the prejudicial effect of the publicity here involved could be removed by a change in the time and place of trial accompanied by proper precautions taken by the trial court. Such curative steps could remove "even the probability of unfairness." Sheppard v. Maxwell, supra, 384 U.S. at 353, 86 S.Ct. 1507.

We have quoted the finding of the district court that the evidence failed to show that Martin did not receive a fair trial due to adverse publicity attendant upon the Court of Inquiry proceeding. After carefully studying the record, we cannot set aside that finding or any of the other findings of the district court as clearly erroneous. See Rushing v. Wilkinson, 5th Cir. 1959, 272 F.2d 633. Martin has not carried his burden of proving that he is in custody in violation of the Constitution of the United States. See 28 U.S.C.A. § 2241(c) (3). The judgment is therefore

Affirmed.

THORNBERRY, Circuit Judge (concurring specially):

Although the events at the Court of Inquiry when measured against the fact that appellant received a fair trial justify affirmance, I am convinced that the procedures of the Court of Inquiry present grave constitutional questions. Appellant contended that he was denied due process since he could not consult with his attorney, confront or cross-examine witnesses, or offer any evidence in his own behalf. The district judge rejected this argument because he viewed the

Court of Inquiry as an investigatory body. While it is true that due process means one thing for "adjudicative proceedings" and quite another for "investigatory proceedings," the powers and purposes of this "Court" create a substantial question of where to pigeonhole it. The latest Supreme Court decision is Hannah v. Larche, 1960, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307. There, potential witnesses attempted to enjoin the Civil Rights Commission's investigation of voting deprivations because they could not cross-examine witnesses or know the names of their accusers. The Court rejected their claim because the Commission's function was purely investigatory: It could take no affirmative action affecting legal rights and was empowered only to file reports that would form the basis for subsequent de novo action.[1] Since the justice of the peace in the instant case had the power to arrest his court was not a passive body.

Another decision might suggest that the power to arrest is not enough. See In Re Groban, 1957, 352 U.S. 330, 77 S. Ct. 510, 1 L.Ed.2d 376. Unlike Groban, however, the Court of Inquiry is not a mere administrative inquiry for securing information useful generally in the prevention of crime, but is aimed toward the apprehension and prosecution of persons believed guilty of certain specific crimes. As the majority indicates, the State admits that people were summoned to see how many were involved in this scandal, what that involvement was, whether there was any criminal activity, and the scope and extent of that criminal activity. Furthermore, the circumstances fostering this proceeding suggest that individual accusations were contemplated. The grand jury had this whole matter under investigation when the court was con-

vened. Yet the State has urged that none of the evidence solicited was introduced before the grand jury or at the trial. One wonders then why this court was necessary and what function it served. Because of the atmosphere and the court's purpose, it belies reality to say appellant and others were summoned solely as witnesses. Instead, this procedure and publicity surrounding it evince a purpose to expose appellant and others to the public as criminal suspects and to demonstrate not only that they were involved in this scandal but the specifics of their involvement. That factor distinguishes this case from Hannah (voting rights) and Groban (fire prevention) because the sole purpose and intent of the investigations in those cases was not aimed at the production of individual accusations. See Note, 74 Harv.L.Rev. 120, 121 (1960). Indeed, the fact that future prosecutions resulted was merely ancillary to the paramount undertaking. In contrast, the Texas statute creating the Court of Inquiry confirms that its sole purpose and function is to determine if a criminal law has been violated.[2]

The fact that the proceeding is accusatory may not be decisive so long as Anonymous Nos. 6 & 7 v. Baker, 1959, 360 U.S. 287, 79 S.Ct. 1157, 3 L.Ed.2d 1234, is the law. See Note, 74 Harv.L.Rev. 120 (1960). There the Supreme Court held that a witness did not have the right to counsel simply because the investigation might lead to future criminal prosecutions. There is a fundamental difference, however, between the Baker investigation into possible unethical practices of law that may lay groundwork for future criminal prosecution and a Court of Inquiry that is a part of the State's process of criminal prosecutions. The Hannah, Groban and Baker investigations are dif-

---

1. This limited function has served as the main justification for the Hannah holding. See Note, 47 Cornell L.Rev. 71 (1961); Note, 30 U.Cinn.L.Rev. 234 (1961); Note, 12 Syracuse L.Rev. 206 (1960).

2. At least one commentator has argued that where a proceeding has for its purpose the sifting of charges that a criminal law has been violated, the witnesses have the right to confront and cross-examine witnesses. See Note, 12 Syracuse L.Rev. 206, 218 (1960). That factor was important to the majority in Hannah and was also emphasized by Mr. Justice Frankfurter in his concurrence.

ferent from the Court of Inquiry because its sole purpose is to determine if there has been any violation of the criminal law and also because it is conducted as an official segment of the State's criminal prosecutions. These distinctions prompt my misgiving about the district court's holding.

Even accepting the district court's holding, my doubts about this carnival proceeding persist. Additional unfairness stemmed from the fact that it was broadcast live and on tape on both radio and television and that the testimony was printed in the papers. Such publicity seems at variance with elemental requirements of fair play. It was important to the majority in *Baker* and *Groban* that any incriminating evidence was not made available to the public. Indeed, these investigations were secret. In *Hannah,* the Commission's rules provided that any evidence or testimony that tended to "defame, degrade, or incriminate any person" had to be taken in executive session. Moreover, any witness could refuse to be photographed or televised.[3] It would seem that in balancing the State's interest in investigating crime and the individual's right to due process, there is no justification for permitting incriminating evidence to be fed to the public. This position does not require secret hearings, but simply demands that there be no open and public accusations of crime and that any incriminating evidence not be broadcast live or put in print and then distributed to the public. Since prohibiting broadcast of proceedings when focused directly on the individual neither disrupts the fact-finding function of the hearing nor causes delays, it is a rational limitation on the State's power to investigate matters perilously close to the criminal process. However, because I am convinced that appellant received a fair trial in which none of the evidence used against him was discovered originally by the Court of Inquiry, I do not make a final resolution of the constitutionality of these procedures, and therefore concur in the majority's holding.

The disposition of the grand jury issue causes me more serious problems. Appellant argues that the Court of Inquiry usurped the grand jury's function and that the publicity invalidated the grand jury indictment system. The majority reasons that because *Hurtado* held that the grand jury requirement is not binding on the states, the method of investigation is a matter peculiarly within the province of the State of Texas. To me, the question is not whether Texas has to indict by a grand jury, but whether that method, once chosen, must produce an impartial grand jury and whether the publicity in this case destroyed impartiality. Although several Supreme Court decisions suggest that the grand jury must be impartial,[4] a recent decision proves that the issue has not been settled. See Beck v. Washington, 1962, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98. The argument advanced to support requiring an impartial grand jury is that it has traditionally stood between the prosecutor and the accused in order to prevent unfounded prosecutions. See Hale v. Henkel, supra, at 59, 26 S.Ct. 370.[5] The ma-

---

3. Commentators have uniformly endorsed the view that evidence that focuses on the individual should be taken in executive session. See Note, 47 Cornell L.Rev. 71 (1961); Note, 74 Harv.L.Rev. 120 (1960). If the fifth amendment is to be the only defense for these persons, it does not seem fair to require them to assert it continuously in front of the public whose most likely reaction will be an inference of guilt from the assertion. See Grunewald v. United States, 1957, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931.

4. See Lawn v. United States, 1958, 355 U.S. 339, 349, 78 S.Ct. 311, 317, 2 L.Ed.2d 321; Costello v. United States, 1956, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397; Hoffman v. United States, 1951, 341 U.S. 479, 485, 71 S.Ct. 814, 817, 95 L.Ed. 1118; Cassell v. State of Texas, 339 U.S. 282, 298, 70 S.Ct. 629, 94 L.Ed. 839; Hale v. Henkel, 1905, 201 U.S. 43, 59, 26 S.Ct. 370, 373, 50 L.Ed. 652.

5. This view has also been explained by stating that the jurors must be impartial since the grand jury represents the "voice of the community" and its only limi-

jority of courts have not followed the Supreme Court's intimations and have held that there is no constitutional right to an impartial grand jury. Gorin v. United States, 1st Cir. 1963, 313 F.2d 641; United States v. Kahaner, S.D.N.Y. 1962, 204 F.Supp. 921. In Estes v. United States, 5th Cir. 1964, 335 F.2d 609, this Circuit seemed to hold that there is no right to an impartial grand jury. Thus, beyond testing the legal qualifications of the grand jurors and whether they represent a cross-section of the community, the only question is whether the juror voted for the indictment honestly and on competent evidence. See State v. Beck, 56 Wash.2d 474, 349 P.2d 387, 389 (1960).[6]

These absolute pronouncements have been qualified by courts when confronted with the issue of whether pre-indictment publicity destroyed the impartiality. Thus courts state that no impartial grand jury is required, but then conclude that anyway no prejudice was shown.[7] This ambivalence has clouded the issue. Both *Beck* and *Estes* take that approach and require a specific showing of bias or prejudice. *Estes* also suggests that a mere showing of adverse publicity does not itself constitute a showing of prejudice. 335 F.2d at 613.[8] The district court followed *Beck* and *Estes* and held

there was no specific proof of prejudice or bias. My question is whether Estes v. State of Texas, 1965, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, changes the rules insofar as live television broadcasts are concerned. There the Court held that a television broadcast created such a probability of prejudice that its use was inherently lacking in due process and removed the need to show isolatable prejudice. It could be argued that *Beck* is therefore not controlling since that investigation was not televised at the time the grand jury was considering his case. Furthermore, in Sheppard v. Maxwell, 1966, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, the Court adopted the *Estes* approach where massive pretrial publicity was present. The publicity here is clearly as massive. If there is a right to an impartial grand jury and if the problem is one of proof, then *Sheppard* and *Estes* present vexing questions since both reflect a change in judicial thinking since *Beck* on live television and massive press coverage. It is not clear, however, whether these cases would remove the burden to show specific prejudice in the case of grand jurors. Courts might adhere to the specific proof requirement by holding that the grand juror's duty to ferret out crime includes using the information that publicity reveals. See Unit-

tation is the conscience of the members. Goodman, Charge to the Grand Jury, 12 F.R.D. 495 (1952); Note, Some Observations on the Beck Case, 36 Wash.L.Rev. 134, 139 (1961). Only one decision and the commentators support this position. See Coppedge v. United States, 1962, 114 U.S.App.D.C. 79, 311 F.2d 128; Calkins, Grand Jury Secrecy, 63 Mich.L.Rev. 453, 474; Note, Unconstitutionally Obtained Evidence Before the Grand Jury As A Basis for Dismissing the Indictment, 27 Md.L.Rev. 168, 177 (1967); Note, The Texas Grand Jury Selection System— Discretion to Discriminate, 21 Sw.L.J. 545, 546, (1967); Note, The Grand Jury As An Investigatory Body, 74 Harv.L. Rev. 590, 600 (1961).

6. The basis for holding that the grand jurors do not have to be impartial is that the grand jury is considered an accusatory body that does not pass on the guilt or

innocence of the defendant but merely determines whether he should be brought to trial. See Beck v. United States, 9th Cir. 1962, 298 F.2d 622; United States v. Remington, 2d Cir. 1951, 191 F.2d 246, 252; United States v. Knowles, D.C. 1957, 147 F.Supp. 19; United States v. Smyth, N.D.Calif.1952, 104 F.Supp. 283, 302.

7. United States v. Osborn, 6th Cir. 1965, 350 F.2d 497; Gorin v. United States, 1st Cir. 1963, 313 F.2d 641; United States v. Holovachka, 7th Cir. 1963, 314 F.2d 345; Beck v. United States, 9th Cir. 1962, 298 F.2d 622; United States v. Baker, D.C.1966, 262 F.Supp. 657; United States v. Hoffa, S.D.Fla.1962, 205 F. Supp. 710; United States v. Dioguardi, S.D.N.Y.1956, 20 F.R.D. 33.

8. See United States v. Osborn, supra, 350 F.2d at 507; United States v. Baker, supra; United States v. Hoffa, supra.

ed States v. Nunan, 2d Cir. 1956, 236 F. 2d 576, 593. This really implies that there is no right to an impartial grand jury. On the other hand, courts could extend *Estes* and *Sheppard* to grand juries by focusing on the parts of those decisions suggesting that because this massive press coverage is increasingly prevalent and difficult to efface, there should be some judicial effort to prevent or neutralize its effect. Here, the lack of judicial control or concern is patent. However, since the decisions hold that there is no right to an impartial grand jury, it is premature to settle the applicability of *Sheppard* and *Estes* to the grand jury—publicity problem. Because the rule today is that the grand jury is an accusatory body which does not have to be impartial and that we depend on a fair trial to secure the liberty promised by the fourteenth amendment, I concur in affirming the judgment of the district court.