

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-07-00002-CR

_____

KENNETH COOKS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th Judicial District Court
Gregg County, Texas
Trial Court No. 33,356-A

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

Kenneth Cooks, having been found guilty by a jury of the murder of James Millis and sentenced to seventy years' imprisonment, has filed his appeal.

Cooks raised eight points of error, which can be summarized as follows: (A) that venue in Gregg County was not proper, the correct venue having been Harrison County; (B) that the prosecuting attorney had a conflict of interest and should have been disqualified; (C) that the trial court erred in permitting evidence of an oral statement by Cooks; (D) that the jury failed to follow the evidence in rejecting Cooks's insanity defense; and (E) the evidence was factually and legally insufficient to sustain Cooks's conviction of murder.

**FACTS OF THE CASE**

The State's case-in-chief was quite lengthy, having over thirty witnesses, of whom twenty were associated with law enforcement in some capacity.

The facts showed that on June 11, 2005, Cooks did not have much money. He had haggled over the purchase of a lug wrench and the person accompanying him had paid the $5.00 purchase price of it; Cooks borrowed $20.00 from a former employer. Cooks argued with someone he indicated owed him money and told his mother that he was going to kill somebody and throw them into the river. Thereafter, Cooks, his brother, and another person went riding all terrain vehicles and motorcycles near the place that Cooks was living, which was not far from Millis's residence; Cooks

disappeared for awhile and was found by the others sitting on a trailer at Millis's residence. Cooks indicated that he had been instructed by Millis to wait there for him to return.

In the wee hours of the next morning, Cooks appeared at the Kyle's Quick Stop convenience store three times. The first incident was about 1:30 a.m. At that time, Cooks was wearing a tee shirt backwards and old and dirty pants. On that occasion, Cooks was "excited" and "fidgety" and related to the attendant at one time that Jethro Bodine (of the *Beverly Hillbillies* television show) was in his family and at another time that he (Cooks) was either Bodine or that he was Robocop. At that time, Cooks indicated that there were people who wanted to hurt him and that policemen were his friends and could help. The attendant called the Harrison County Sheriff's Office, but Cooks left before the deputies arrived. On the second occasion, at around 3:00 a.m., the attendant telephoned for law enforcement assistance immediately after Cooks arrived. Again, Cooks left before deputies arrived at the convenience store. On this visit, Cooks maintained that it was not he who had previously been at the convenience store but, rather, it had been his identical twin brother; he claimed then that the brother was Robocop and had attempted to kill him but that Cooks killed the brother instead. On this second occasion, Cooks was wearing no shirt and had on new Lee jeans with the tags still attached to them. At some time during this early morning, Cooks drove an old pickup truck to the fire/police complex in Marshall in search of his cousin, an ambulance driver for the City of Marshall; while there, Cooks spoke with Marshall police officers in the parking lot. On Cooks's third visit to Kyle's Quick Stop, he was dressed in the same Lee jeans as before but had donned a blue and white

3

striped shirt. On this third appearance at the convenience store, the clerk immediately called law enforcement again on Cooks's arrival; a Harrison County deputy promptly responded and interviewed him. Noticing a substantial amount of blood in the bed of the old pickup truck Cooks was driving, the deputy asked Cooks about its source; after a rather lengthy hesitation, Cooks indicated that he had hauled the body of a dead dog in the truck earlier and that the blood had come from the dog. Cooks was advised by the deputy that he was no longer welcome at the convenience store and was told to leave.

About 6:45 a.m., Robert Hansford encountered Cooks at a different gas station, attempting to get gasoline. However, the station was closed and Cooks did not have a debit card. He was carrying a wad of cash and offered Hansford $100.00 for a can of gasoline. Cooks was driving the same old pickup truck later identified as belonging to Millis. About fifteen minutes later, Kenneth Deyoung saw a young black man on the side of the road with the hood of the old pickup truck open. Deyoung recognized the truck as one belonging to Millis, a man he had known for many years. About an hour later, Deyoung saw the truck being driven along Pleasant Green Road by the same person, whom he identified as being Cooks.

About 8:30 a.m., Reggie Lawler came to Cooks's recreational vehicle residence to inquire about hiring Cooks to install an engine in a Cadillac which Lawler owned. Cooks requested Lawler accompany him to someone else's house. Cooks was driving Millis's old pickup truck and Lawler followed Cooks to Millis's nearby mobile home in Gregg County. Cooks exited the truck and rapped

4

on the side of Millis's mobile home. Suddenly, Cooks began to call out excitedly, "Hey, man, come here, blood." This frightened Lawler, who hurriedly left and went to the nearby Lakeport Police Station, finding it closed. Lawler then went to the house belonging to James Jones (Cooks's landlord and neighbor) but saw Cooks nearby, so he did not stop; instead, he went to Doug Brown's nearby house; while there, he saw a police car arriving at the Millis place. Cooks had called the police to report the blood he had seen at the Millis mobile home.

When Deputy Sheriff Bobby Clawson arrived at the Millis home, he discovered blood strewn about the premises and spattered on the side of the Millis mobile home. There were bloody paths which indicated that a bleeding body had been dragged to a spot near a pond on the premises and then dragged back to the front of the house. There was blood in the bed of Millis's pickup and Millis was missing from the premises. Since it was a hot day and Cooks was very agitated, Clawson had Cooks sit in the back seat of the patrol car. Cooks was given his *Miranda*[1] warnings and the automobile's videotape recorder was turned on; Cooks denied having done anything wrong.

Cooks was then taken to the Gregg County Sheriff's Office, where he was again interviewed, the interviews being videotaped. On the tape, Cooks related at one point that he had choked Millis and at another point that he had not killed him but had acted in self-defense; he also said that there had been a body in the back of the old pickup truck with some carpet and a cinder block. Although

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

he spoke with the deputies after being advised that he was being videotaped and having been advised of his rights, he refused to sign any statement.  The videotapes were played for the jury.

Cooks was taken to the emergency room of a hospital for a specialist to take samples from under his fingernails and to garner other forensic evidence from his person.  While he was waiting there, Cooks fell asleep and, when he was awakened by the nurse, he inquired, "Did you find the body?"

For reasons not shown in the record, law enforcement officials knew to search for Millis's body in a nearby area of adjoining Harrison County known as Talley Bottoms.  While cruising roads in the area, a Harrison County deputy sheriff observed a place where a vehicle had driven off the public road and through high grass on a private road.  Law enforcement officers followed the path of the crushed-down grass to a place near a pond, where they located Millis's partially-nude body covered with a scrap of carpet.  Millis was dead, having been stabbed, choked, and beaten.  One of his hands was grasping the wire of a nearby fence.  A number of Millis's possessions and some of his clothing were scattered about, some hanging from nearby trees.  Among Millis's possessions on the site was a camera case in which some of Cooks's prescription medication bottles were located.  Keys to Millis's front door and personal safe were found on Cooks's person and Millis's blood was found on Cooks's clothing.  The blue and white striped shirt Cooks was wearing was identified as being either the same one or very similar to the one which Millis's daughter had just recently given him for a Father's Day present; Millis always wore Lee jeans of the type Cooks was wearing on the

6

day of his arrest, and Millis always cuffed the legs in the same fashion as the new Lee jeans were cuffed when worn by Cooks. There was a note with Cooks's bloody fingerprint found in Millis's house.

Throughout, all of the witnesses who observed Cooks's demeanor on June 12 described him by using terms such as "hyper," not "making much sense," "jumping from one thing to another," and "talking out of his head." During the videotape session of Cooks while sitting in the rear seat of the patrol car at Millis's residence, Cooks rambled constantly about cars, Robocop, Jethro Bodine, girlfriends, and a hodgepodge of different subjects; during this, Cooks said, "If I keep on talking long enough, maybe I will begin to make some sense." He never did. Psychiatric professionals concurred that Cooks suffered from advanced schizophrenia.

**QUESTION OF VENUE**

Although stated as a separate point of error, this point (as well as others, mentioned later) avers that the State failed to satisfy a part of its burden of proof. However, venue is not an element of the offense. *Fairfield v. State*, 610 S.W.2d 771, 779 (Tex. Crim. App. [Panel Op.] 1981); *State v. Blankenship*, 170 S.W.3d 676, 681 (Tex. App.—Austin 2005, pet. ref'd). Thus, it need be proved by only a preponderance of the evidence and not beyond a reasonable doubt. *See* TEX. CODE CRIM. PROC. ANN. art. 13.17 (Vernon 2005); *Murphy v. State*, 112 S.W.3d 592, 604 (Tex. Crim. App. 2003); *Fairfield*, 610 S.W.2d at 779; *Blankenship*, 170 S.W.3d at 681; *Sudds v. State*, 140 S.W.3d 813, 816 (Tex. App.—Houston [14th Dist.] 2004, no pet.). It must be remembered, however, that

7

if the issue of venue is timely raised, reversible error may result from the failure to prove venue as laid in the charging instrument. *Blankenship*, 170 S.W.3d at 681. Cooks raised the issue of venue at the time of trial.

The standard for legal sufficiency is set out in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and we apply a somewhat modified version of that test when examining challenges to venue. Under this modified test, we still view all of the evidence in the light most favorable to an affirmative venue finding and ask whether any rational trier of fact could have found by a preponderance of the evidence that venue was proved. *See Duvall v. State*, 189 S.W.3d 828, 830 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *Van Schoyck v. State*, 189 S.W.3d 333, 336 (Tex. App.—Texarkana 2006, pet. ref'd); *Lemoine v. State*, 85 S.W.3d 385, 387 (Tex. App.—Corpus Christi 2002, pet. ref'd). *But see Sudds*, 140 S.W.3d at 816 (quoting *Rippee v. State*, 384 S.W.2d 717, 718 (Tex. Crim. App. 1964) (venue will be upheld "if from the evidence the jury may reasonably conclude that the offense was committed in the county alleged"). Venue will be upheld if the record contains sufficient evidence to support an affirmative finding under any of the alternative venue provisions on which the jury was charged. *Murphy*, 112 S.W.3d at 605.

Here, the evidence showed that there were two injuries which could have been lethal to Millis: the severance of his carotid artery and choking, as evidenced by the crushing of his larynx. The site around Millis's mobile home was notable for the blood splattered around the premises; there was a trail of blood leading from the mobile home to a small pond and another trail of blood back;

8

there was a sufficient amount of blood in the bed of the pickup truck that it was noticed by a deputy sheriff who saw Cooks at the convenience store in the early morning hours, when it was not fully daylight.

Cooks raised the issue of venue at the trial court level. Therefore, the presumption permitted in Rule 44.2(c)(1) of the Texas Rules of Appellate Procedure that venue was established does not apply. *See* TEX. R. APP. P. 44.2(c)(1). On the other hand, "If a person receives an injury in one county and dies in another by reason of such injury, the offender may be prosecuted in the county where the injury was received or where the death occurred, or in the county where the dead body is found." TEX. CODE CRIM. PROC. ANN. art. 13.07 (Vernon 2005). In this case, it appears that no one but the perpetrator and the victim witnessed the actual killing itself; no physicians were present when Millis died so they could testify regarding the issue of precisely when and where he breathed his last. The actual site where Millis died had to be established by circumstantial evidence.

It has long been held that "[v]enue . . . may be proved by circumstantial as well as direct evidence. It is sufficient, if from the evidence, the jury may reasonably conclude that the offense was committed in the county alleged." *Curtis v. State*, 167 Tex. Crim. 536, 321 S.W.2d 587, 589 (1959). Even the more basic question of jurisdiction can be established by circumstantial evidence. *Vaughn v. State*, 607 S.W.2d 914, 920 (Tex. Crim. App. [Panel Op.] 1980); *Torres v. State*, 141 S.W.3d 645, 652 (Tex. App.—El Paso 2004, pet. ref'd).

9

Viewing the evidence at trial in the light most favorable to an affirmative venue finding, the jury could rationally have considered the volume of blood found at Millis's mobile home in Gregg County and, in doing so, it could reasonably find by a preponderance of the evidence that Millis received his fatal injuries in Gregg County. In doing so, it could have rationally and reasonably determined from the evidence before it that the fatal wounds were administered in Gregg County, establishing venue there.

We overrule this point of error.

**DISQUALIFICATION OF PROSECUTOR?**

In a motion for new trial and before this Court, Cooks has complained that William Jennings, the lead prosecuting attorney, had represented Cooks about ten years previously in a burglary and arson case, the conviction in that case being presented as evidence in the case at bar. Cooks alleges that Jennings's previous representation of Cooks disqualified Jennings from acting on behalf of the State. Although Cooks urges two points of error concerning this issue (one being that the alleged conflict of interest impaired Cooks's ability to receive a fair trial and the other that the trial court erred in failing to grant a motion for new trial based on that allegation), these two points are addressed together.

In almost all circumstances, it is the duty of the district attorneys in Texas to represent the State in murder cases "except in cases where he has been, before his election, employed adversely."[2]

---

[2]TEX. CODE CRIM. PROC. ANN. art. 2.01 (Vernon 2005).

10

All Texas prosecutors are attorneys, subject to the Texas Disciplinary Rules of Professional Conduct and Texas courts have often looked to those rules for guidance in conflict of interest issues. *In re EPIC Holdings, Inc.*, 985 S.W.2d 41, 48 (Tex. 1998); *In re Meador*, 968 S.W.2d 346, 351 (Tex. 1998) (orig. proceeding); *see also Anderson Producing, Inc. v. Koch Oil Co.*, 929 S.W.2d 416, 421 (Tex. 1996); *Gonzalez v. State*, 117 S.W.3d 831, 837–38 (Tex. Crim. App. 2003) (using TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08 as guideline); *House v. State*, 947 S.W.2d 251, 252–53 (Tex. Crim. App. 1997) (citing Rule 3.08, cmt. 10, which states: "this rule may furnish some guidance"); *In re Works*, 118 S.W.3d 906, 909 (Tex. App.—Texarkana 2003, orig. proceeding); *In re Bahn*, 13 S.W.3d 865, 872 (Tex. App.—Fort Worth 2000, orig. proceeding).

Rule 1.09 of the Texas Disciplinary Rules of Professional Conduct concerns conflicts of interest. It generally prohibits a lawyer from assuming representation of a client adversely to the interests of a former client "if it is the same or a substantially related matter."[3] A prosecutor should be disqualified when the matter being prosecuted is the same matter for which that attorney previously represented the accused. *Ex parte Morgan*, 616 S.W.2d 625, 626 (Tex. Crim. App. 1981). Extending further, where a subsequent matter is "substantially related," the attorney may also be prohibited from representing a party adverse to the former client. *See EPIC Holdings, Inc.*, 985 S.W.2d at 51; *see also Metro. Life Ins. Co. v. Syntek Fin. Corp.*, 881 S.W.2d 319, 320 (Tex. 1994). This "substantial relationship" test is a product of common law and predates the Texas Disciplinary

---

[3]TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(a), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon Supp. 2007).

11

Rules of Professional Conduct for attorneys. *In re Cap Rock Elec. Co-op., Inc.*, 35 S.W.3d 222, 230 (Tex. App.—Texarkana 2000, orig. proceeding).

The reasoning behind this prohibition of first representing a person charged with a crime and then, upon becoming the prosecutor, representing the State is clear:

> there exists the very real danger that the district attorney would be prosecuting the defendant on the basis of facts acquired by him [or her] during the existence of his [or her] former professional relationship with the defendant. Use of such confidential knowledge would be a violation of the attorney-client relationship and would be clearly prejudicial to the defendant.

*Morgan*, 616 S.W.2d at 626.

A cogent distinction between this case and others mentioned above is that this case was not the same as the previous case, which was tried some ten years previous. Its only connection with this case is that the conviction in the older case could have played a part in the punishment meted out to Cooks. However, the previous conviction was public record, the fact of which was available to any prosecutor; the knowledge of its existence was not unique to this prosecutor.

In his argument at the hearing on his amended motion for new trial, Cooks cited a decision by this Court[4] as authority for the proposition that an attorney who represents a criminal defendant and then becomes the district attorney is disqualified from representing the State against that individual in the future. There are several problems with that position. The first problem is that this

---

[4]*In re Goodman*, 210 S.W.3d 805 (Tex. App.—Texarkana 2006, orig. proceeding).

is a misstatement of the ruling of this Court in that case. Specifically, this Court unequivocally stated that the ruling in that case

> should *not* be read as an endorsement of the idea that a district or county attorney is forever barred from prosecuting his or her former clients. That is not the law, nor should it be. Instead, a disqualification should occur only when (1) the underlying proceeding is so substantially related to real and actual disclosures (as opposed to theoretical discussions) that occurred during the previous attorney-client relationship, *and* (2) there exists a genuine threat that disclosure of these confidential communications will either materially advance the State's case or drastically undermine the accused's ability to mount a defense--such that this advancement or undermining rises to the level of a due-process violation. We believe such is the case here, but only because of the discrete facts in the record before us.

*Goodman*, 210 S.W.3d at 815–16.

Second, in the *Goodman* case, the defendant presented affidavits in support of his position that the prosecutor should be disqualified in Goodman's driving while intoxicated (DWI) case which related (a) that the prosecutor, Young, had represented Goodman in a previous DWI case, (b) that Goodman had confidentially discussed his drinking habits at length with Young, and (c) that Goodman's drinking habits were an integral part of the prosecution of his current case. Contrarily, there has been no showing here of any evidence that there was any information communicated to Jennings in the decade-old previous case which could compromise Cooks's defense or which could have been employed by the State in prosecuting its case against Cooks; any disadvantage to Cooks or any edge to the State which might have arisen due to the former attorney-client relationship between Cooks and Jennings remains totally speculative. In short, Cooks has shown no violation of his due-process rights occurred because of the subsequent representation of the State by Jennings.

13

Despite the fact that the *Goodman* case (which was a case on a petition for writ of mandamus) was subsequently set aside because the higher court found that the issue of prosecutor disqualification to that case lacked the "indubitable provenance" to dictate a ministerial act which the trial court was compelled to perform,[5] we believe that this Court accurately set out the bases for what constitutes a violation of due-process rights relating to such a situation. For instance, we reiterate that our statement that "merely because a prosecutor once served as an accused's attorney for a traffic ticket does not now automatically prohibit that attorney from prosecuting the accused for murder," *id.* at 816, is a sound example of a situation wherein due-process violations are not implicated by a subsequent adverse position of a prosecutor in a later prosecution. Even though, in the older case in which Jennings represented Cooks, Jennings raised doubts of Cooks's sanity *at that time*, Cooks has failed to show any link between the previous decade-old representation by Jennings and the current case which would either have benefitted the State or would have acted to Cooks's detriment. Absent such a link, Jennings was not disqualified from carrying out the duties imposed on him by law to prosecute the murder case, a distinctly different case from that in which Jennings previously represented Cooks.

This point of error is overruled.

---

[5] *State ex rel. Young v. Sixth Judicial Dist. Court of Appeals at Texarkana*, 236 S.W.3d 207, 212 (Tex. Crim. App. 2007), in which the Texas Court of Criminal Appeals did observe that while the rules concerning prosecutor disqualification in a different case did not then explicitly exist, those set out in *Goodman* "may well ultimately prove the appropriate rule of law in criminal cases."

14

**TESTIMONY REGARDING ORAL STATEMENT BY COOKS**

The testimony of which Cooks complains involves testimony about the statement made by Cooks when he was awakened by nurse Sandra Marek at the hospital: "Did you find the body?" This statement by Cooks was overheard by Marek and by Cecil Shelton, a deputy sheriff, both of whom testified about this utterance over Cooks's objection.

The basis for Cooks's objection to this testimony rests in Article 38.22, Section 3 of the Texas Code of Criminal Procedure, which states that "No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless" it has been recorded and the recording shows the administration of certain warnings set out in Article 38.22, Section 2. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3 (Vernon 2005).

At the time these witnesses testified concerning this statement, the trial court ruled that it was not made as the result of a custodial interrogation but, instead, was a spontaneous utterance, not subject to the constraint mentioned above.

Cooks's brief concentrates on the use of the word "utterance" by the trial court in making its ruling, pointing out that the statement made by Cooks did not fit into the mold cast for excited utterances. (If the statement were to have been properly classified as an excited utterance, then it would be admissible pursuant to Rule 803(2) of the Texas Rules of Evidence.)

15

However, this use of the word "utterance" does not limit our review of this matter to the application of Rule 803(2) to the introduction of excited utterances into evidence. Even when the trial judge gives the wrong reason for his decision, *Salas v. State*, 629 S.W.2d 796, 799 (Tex. App.—Houston [14th Dist.] 1981, no pet.), if the decision is correct on any theory of law applicable to the case, it will be sustained. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).[6]

Although it is plain that Cooks's statement was not an excited utterance which would be admissible under that rule, it is a statement which was made spontaneously as he was awakened by a nurse, not made as the result of a custodial interrogation. Article 38.22, Section 5 of the Texas Code of Criminal Procedure specifically exempts "a statement that does not stem from custodial interrogation" from those oral statements which are otherwise proscribed. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 5 (Vernon 2005).

Plainly, the custodial interrogation of Cooks had ceased for a time. Cooks fell asleep. When he awoke, without prompting or urging, he blurted out the question which was then foremost in his mind, inquiring whether the body of the dead man had been located. The statement, not being made in the course of a custodial interrogation, was volunteered and does not fall within the prohibition of Article 38.22 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 2005).

---

[6]Actually, it does not appear that the trial judge allowed introduction of the evidence for the wrong reason anyway. Although he used the word "utterance" in making his ruling when the evidence was introduced through Shelton, he called it a "spontaneous" statement when presented through the testimony of Marek; this was correct.

16

For these reasons, there was no error in permitting the introduction of evidence regarding Cooks's spontaneous outburst when awakened.

We overrule this point of error.

**JURY ERRED IN NOT FINDING COOKS LEGALLY INSANE?**

If there is a consistent theme which can be followed throughout the trial of Cooks, it is the unanimity of the testimony of each of the three experts who testified that Cooks suffers from schizophrenia and is very mentally ill. The conduct described by each of the witnesses who observed Cooks on the day of the murder ratifies to any lay observer that he was in the throes of mental illness.

However, "Mere mental deficiency or derangement, though it may constitute a form of insanity known to and recognized by medical science, does not excuse one for crime." *Graham v. State*, 566 S.W.2d 941, 949 (Tex. Crim. App. 1978); *Ross v. State*, 153 Tex. Crim. 312, 220 S.W.2d 137, 144 (1949). *Resendiz v. State*, 112 S.W.3d 541, 548 (Tex. Crim. App. 2003), mentions the distinction between being "crazy" or mentally ill as distinguished from legal insanity. The condition of suffering from mental illness alone does not exculpate someone from his criminal act; rather, the measure to be applied is that "as a result of severe mental disease or defect, [the defendant] did not know that his conduct was wrong." TEX. PENAL CODE ANN. § 8.01 (Vernon 2003). Therefore, there is a difference between the medical definitions for insanity and the legal definition of it. For our purposes, therefore, the terms "insane" or "insanity" as used henceforth will be applied only to the

17

legal definition of the words as they apply to a defense against criminal prosecution and not to the medical ones.

Insanity is an affirmative defense to criminal charges[7] which must be proved by a preponderance of evidence. TEX. PENAL CODE ANN. § 2.04 (Vernon 2003).

Cooks now complains that it was error for the jury to have failed to find that Cooks met his burden of proof concerning his insanity.

Whether a person is insane is a question of fact for a jury to determine, not a medical question and not a question of law. Ultimately, the issue of insanity at the time of the offense excusing criminal responsibility lies in the province of the jury, not only as to the credibility of the witnesses and weight of the evidence, but also as to the limits of the defense itself. *Graham*, 566 S.W.2d at 953.

> [W]hen the courts of appeals are called upon to exercise their fact jurisdiction, that is, examine whether the appellant proved his affirmative defense or other fact issue where the law has designated that the defendant has the burden of proof by a preponderance of evidence, the correct standard of review is whether after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust.

*Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex. Crim. App. 1990).

An examination of the facts presented shows, of course, the large number of lay witnesses who testified about the irrational behavior demonstrated by Cooks on the day of the murder and the day before it occurred. Evidence was presented that Cooks had been constrained in the recent past

---

[7]TEX. PENAL CODE ANN. § 8.01.

at a psychiatric hospital in California. There were three psychiatric experts that testified that Cooks was schizophrenic. The two psychiatrists called by the State testified that Cooks was not insane, pointing out that his claim to the investigating policemen on the day of the murder that he was acting in self-defense and his claim that he had done nothing wrong indicated that he had an awareness that what he had done was, indeed, wrong. Frank Murphy, the psychiatrist called by Cooks, testified that he had not been instructed to examine Cooks to test his ability to distinguish right from wrong and that, judging from his responses during the interview with law enforcement officers, there was a distinct possibility that he possessed that ability. The only person to testify that Cooks did not have the capacity to distinguish right from wrong was Cooks's mother.

In its questioning of witnesses and in its closing arguments, the State conceded that Cooks was mentally ill; there is no controversy as to that issue. The controversy was whether his illness was of the severity or the nature that he was insane at the time of the murder of Millis (i.e., that Cooks did not recognize that the killing of Millis was a wrongful act). Things which go toward meeting the burden of proof of Cooks's insanity were his delusions about his own identity, his generally consistent irrational behavior, his call to law enforcement officials to inform them of the situation at the Millis mobile home, and the testimony of Cooks's mother that Cooks could not distinguish right from wrong. Evidence that Cooks made a rather lame attempt to hide Millis's body by removing it to the wilds of Talley Bottoms is potent evidence that he recognized that the killing was wrong and that he was attempting to conceal the act. Cooks's actions in taking someone to

19

Millis's mobile home after the murder and his feigning shock and surprise at the blood, together with his telephone call to law enforcement offices could be construed as an inept attempt to draw suspicion of his involvement in the murder away from him. The testimony of three psychiatric professionals that his mental illness did not impair his ability to distinguish right from wrong is very compelling evidence. The jury has the opportunity to hear the evidence as given and thereby determine the credence to give to the witnesses and the weight to apply to their testimony.

In a factual sufficiency review, it is our duty to review all the evidence in a neutral light and determine whether the evidence supporting the verdict is so weak or is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly unjust. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006); *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006); *Wesbrook v. State*, 29 S.W.3d 103, 112 (Tex. Crim. App. 2000); *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996).

The insanity defense was the burden of Cooks to prove. A jury reasonably found that he failed to meet that burden of proof. We do not find fault with that finding and will not disturb it.

We reject this point of error.

## WAS THE EVIDENCE LEGALLY AND FACTUALLY SUFFICIENT?

Although Cooks breaks this question into portions, these issues will be addressed together. The standard for factual sufficiency review is stated above and is not repeated here.

In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). Although our analysis considers all evidence presented at trial, we may not re-weigh the evidence and substitute our judgment for that of the jury. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). In essence, if the evidence as presented in a criminal case has not met the standard of legal sufficiency, it should never have been presented to the jury in the first place. *Hyett v. State*, 58 S.W.3d 826, 830 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). A conviction based on evidence insufficient to meet a legal sufficiency challenge is a denial of the due-process rights guaranteed under the United States Constitution.

A detailed reiteration of the chronological occurrences in this case would be redundant. As mentioned before, the evidence—though circumstantial—is voluminous; all of it points solely to Cooks as having murdered Millis. The motive is murky; one cannot determine if Cooks was first led to commit the crime to steal Millis's truck, money, and clothes or was prompted by the demons of his irrational thought patterns with the thefts as an afterthought. However, the motive is secondary to the fact that the overwhelming evidence of guilt satisfies both the legal and factual standards set out above.

We overrule this point of error.

We affirm the judgment.

Bailey C. Moseley
Justice

Date Submitted:     January 3, 2008
Date Decided:       February 6, 2008

Do Not Publish